TENNESSEE ELECTRIC POWER CO. *v.* MAYOR AND ALDERMEN
OF TOWN OF FAYETTEVILLE.

(*Nashville,* December Term, 1937.)

Opinion filed April 2, 1938.

112

HOLMAN & HOLMAN, of Fayetteville, for appellants.

L. N. SPEARS, of Chattanooga, AUST, McGUGIN & COCH-

RAN, of Nashville, and W. B. LAMB, of Fayetteville, for appellee.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

The bill asks that chapter 32 of the Public Acts of 1935 be declared unconstitutional and void, the principal contention being that it violates that clause of article 2, section 17, of the State Constitution which provides: "No bill shall become a law, which embraces more than one subject; that subject to be expressed in the title." The title of the involved act is as follows:

"An Act to authorize counties, incorporated cities and towns in the State of Tennessee to construct, purchase or otherwise acquire, and to operate and maintain electric generating or distributing systems, within or without the county or corporate limits, to construct, purchase or otherwise acquire, to operate maintain or use, individually or jointly, a transmission line or lines, within or without the corporate or county limits, to make improvements, extensions, betterments or additions to such electric systems, and such transmission line or lines to furnish electric power and energy to any consumer or consumers, to finance such acquisition, improvement, extension, betterment, or addition by the issuance of bonds and the acceptance of Federal grants, to provide for the supervision, management and control of such electric systems and such lines, to prescribe rules and policies to govern resale rates, disposition of revenue, and other operating and management practices of such systems, in order to promote the increased domestic use of electricity in rural and urban areas by enabling such counties, incorpo-

rated cities and towns to utilize the surplus power generated by the Tennessee Valley Authority, or the power generated at any other works or dams.''

█ This is a very broad and comprehensive title which embraces every phase of an electric utility, including the construction or purchase of a plant, its financing, operation, and management, the sale of power, and the disposition of revenue derived from such sale. In other words, the title outlines a complete system for the construction and operation of such a plant, so that any provision in the body of the act that may be related to such a utility as that provided for in the caption is necessarily germane thereto. It is only with respect to such provisions in the body of the act as are foreign to and incongruous with the title that complaint can be made. We will proceed, therefore, to a consideration of the provisions of the act which complainant insists relate to a subject not expressed in the title. The main attack is directed at section 13 which after creating a ''board of public utilities'' to control, operate and manage the plant concludes as follows:

''Municipalities now or hereafter owning or operating a waterworks and/or sewerage works may confer upon the board the jurisdiction over such waterworks and/or sewerage works now or hereafter vested in any other board, commission or other body. If the board is given jurisdiction over such works it shall keep separate accounts for the electric plant and each works, making due and proper allocation of all joint expenses, revenues and property valuations.''

It is insisted that the foregoing provision deals with two subjects, to wit, ''waterworks'' and ''sewerage works,'' which are outside of and not covered by the title.

To understand properly what the Legislaure had in mind it is proper to consider certain other sections of the act, a fundamental principle running through the entire act being the segregation of revenue derived from the electric service for the purpose of paying its operating expenses and the indebtedness incurred in the construction or purchase of the plant.

Section 3 (d) empowers municipalities to make indebtedness for the acquisition or improvement of the plant, "and to pledge all or any part of the revenues derived from electric service to the payment of such debts or repayment of money borrowed."

Under section 4 it is provided that the election resolutions must contain a statement showing whether the bonds will be payable (1) exclusively from revenues, or ' (2) exclusively from taxes, or (3) from taxes only in the event of a deficiency in revenues, or (4) from taxes and additionally secured by the pledge of revenues.

Under section 8 (b) a municipality is given authority to pledge all or any part of revenues derived from electric service.

Section 8 (j) authorizes the municipality to vest in a trustee the right to receive all or any part of the income and revénues pledged and assigned to or for the benefit of bondholders and to hold, apply, and dispose of the same in accordance with the covenants in the bonds.

Section 9 authorizes a mandamus or other suit against the board so as to require it to segregate or set aside the revenues derived from the electric plant if pledged to secure the payment of bonds.

Section 10 (a) provides for the appointment of a receiver in the event of default to take possession of the electric plant and to receive the revenues and deposit

such moneys in a separate account to be applied in accordance with the obligations of the municipality. It also authorizes an accounting by court proceeding against the board or trustee.

Section 17 in legal effect makes the income derived from the operation of the electric plant a trust fund for the payment of operating expenses, bond interest, and retirement and/or sinking fund payments and for improvements upon the plant. This section further provides for electric rates based upon historical cost of the plant, and any excess income over the cost of operation and other requirements must be used for the reduction of rates.

Under section 18 any other department or works of a municipality, such as waterworks for example, must pay for electric current at rates applicable to other customers and the funds kept separate.

██ ██ It will be observed that in the above-quoted portion of section 13 the Legislature, with regard to the management of sewerage and waterworks, did not confer jurisdiction upon the "board of public utilities," which it could have done. It did say that municipalities operating an electric plant under the act might do so. Such municipalities most likely were already vested with that power. The object of the Legislature was not to confer additional authority upon municipalities, but to require them to keep the revenue derived from their power plant separate from other revenue. The Legislature realized that a municipality, as a matter of convenience and economy, might confer upon the "board of public utilities" the operation or management of its sewerage and waterworks therefore exercised by some other board or commission, and simply expressed its assent thereto

upon condition that "it shall keep separate accounts for the electric plant and each works." The Legislature, in our opinion, was legislating solely with regard to the electric plant, and was not attempting in any manner to amend, modify or repeal any statutes pertaining to sewerage or waterworks. It did not empower municipalities to confer such jurisdiction on the "board of public utilities." In saying that municipalities "may confer upon the board the jurisdiction" over waterworks and sewerage works, the word *may* was used to indicate possibility not permission. As we say, he may live, or he may die, meaning that it is possible that he may live, or it is possible that he may die, not that we permit him to live, or that we permit him to die. Taking the act of 1935 in its entirety, we readily conclude that the construction which we have given it accords with the legislative will. It is an elementary principle of construction that if a statute is susceptible of two reasonable constructions, one that will sustain its constitutionality and one that will detroy the act, it is the duty of the court to adopt the construction which will preserve the law. *Palmer* v. *Express Co.,* 129 Tenn., 116, 165 S. W., 236; *Texas Co.* v. *Fort,* 168 Tenn., 679, 80 S. W. (2d), 658; *Soukup* v. *Sell,* 171 Tenn., 437, 491, 104 S. W. (2d), 830.

The following part of section 6 is the basis for the second attack on the act, to wit:

"No suit, action or proceeding questioning the validity of bonds issued under this Act or proceedings for the issuance of such bonds shall be commenced after the expiration of twenty days from the date of publication, or publication and posting, as the case may be, of such an Election Resolution and such a Statement, substantially in the form above set forth."

It is contended that this provision of the act is not covered by the caption, and further that it is not due process of law within the meaning of article 1, sections 8 and 17, of the State Constitution. This we consider a reasonable and salutary requirement. Prior to an election interested parties have ample opportunity to consider the legality of the statute authorizing the issuance of bonds, and twenty days following the election is sufficient time for interested parties to determine whether they wish to contest the election. Section 2123 of the Code, requiring a contest for the office of judge or district attorney general to be instituted within twenty days after the election, was upheld by this court in *Harmon* v. *Tyler,* 112 Tenn., 8, 83 S. W., 1041.

A similar provision to that here involved was approved in *Watters* v. *Bayonne,* 89 N. J. Eq., 384, 104 A., 770, 771, the court stating that the reason for the requirement "is to prevent any action after the expiration of the 20-day period which would cast a cloud upon the validity of the bonds."

The Constitution of Louisiana, adopted in 1921, article 14, section 14, expressly provides that such a contest must be instituted within sixty days after the election. *Roberts* v. *Evangeline Parish School Board,* 155 La., 331, 99 So., 280.

Public and corporate bonds in the hands of innocent holders for value before maturity are neither subject to antecedent equities, nor invalidated by mere irregularities, not going to the power to issue the same. 15 C. J., 627; *Nickey Bros.* v. *Lonsdale Mfg. Co.,* 149 Tenn., 1, 7, 257 S. W., 403, 31 A. L. R., 1383; *Irwin* v. *Bedford County,* 151 Tenn., 402, 270 S. W., 81. In this last-named case the court sustained an act authorizing

the issuance and sale of bonds pursuant to an election which contained the recital that "all bonds issued under the provisions and authority of this Act shall be incontestable obligations of such county issuing same." Pub. Acts 1919, chapter 175, section 3.

A county or a municipality having the power to issue bonds when approved by popular vote could dispose of the bonds immediately after the election, and, in the hands of a holder in due course, their validity could not be questioned for irregularities in the election, or for irregularities in their execution and sale. Such a limitation undoubtedly makes the bonds more salable, and at the same time it gives any interested person a reasonable opportunity to contest their validity. The incontestable clause is an element or characteristic of the bonds just as is the provision exempting them from taxation, or the requirement that they shall not bear interest in excess of 6 per cent. per annum, and is clearly related to the title which authorizes the issuance of bonds for the purpose of financing the plant. All measures which will or may facilitate the accomplishment of the purpose stated in the caption may be properly included in the body of the act and are germane to its title. *Knoxville* v. *Gass,* 119 Tenn., 438, 104 S. W., 1084; *Memphis St. Railroad* v. *Byrne,* 119 Tenn., 278, 104 S. W., 460; *Condon* v. *Maloney,* 108 Tenn., 82, 65 S. W., 871; *State* v. *Yardley,* 95 Tenn., 546, 32 S. W., 481, 34 L. R. A., 656; *Cole Manufacturing Co.* v. *Falls,* 90 Tenn., 466, 16 S. W., 1045.

The third complaint is directed at section 11 of the act, which is as follows:

"That bonds may be issued under this Act notwithstanding and without regard to any limits or restriction on the amount or percentage of indebtedness or of out-

standing obligations of any municipality contained in any law.''

In the title to the act the issuance of bonds is authorized. Section 11 simply provides that the amount of such bonds shall not be limited. This the Legislature had a right to do, since the Constitution contains no restriction or limitation on the amount of indebtedness that a county or a municipality may incur. The section specifying the amount of bonds that may be issued is germane to the title.

In the fourth place, it is insisted that subsection (g) of section 3 is broader than the caption. That provision is as follows:

''To make contracts and execute instruments containing such covenants, terms, and conditions as in the discretion of the municipality may be necessary, proper or advisable for the purpose of obtaining loans from any source, or grants, loans or other financial assistance from any Federal Agency; to make all other contracts and execute all other instruments as in the discretion of the municipality may be necessary, proper or advisable in or for the furtherance of the acquisition, improvement, operation and maintenance of any electric plant and the furnishing of electric service; and to carry out and perform the covenants terms and conditions of all such contracts or instruments.''

Upon this question counsel argue that the body of the act authorizes any and all kinds of financing, while its caption limits the financing to issuance of bonds and acceptance of Federal grants. All written obligations have come to be commonly known as bonds, including notes, duebills, or any other evidence of indebtedness. *Shields* v. *Williams*, 159 Tenn., 349, 19 S. W. (2d), 261. It was

not the purpose of the Legislature, as heretofore stated, to limit the indebtedness that might be incurred in establishing these plants, and the words "bonds" sufficiently embraces any obligation that the municipality may incur.

■ In the fifth place, it is urged that the body of the act creates a "board of public utilities" to operate and manage the plant, a subject not expressed in the title. This, in our opinion, is amply covered by the recital "to provide for the supervision, management and control of such electric systems."

We have carefully considered the objections interposed to the validity of the involved act and find that they are without merit. It follows that the decree of the chancellor declaring the act unconstitutional will be reversed and the bill dismissed.

In view of the conclusions reached with respect to chapter 32, Pub. Acts 1935, we find it unnecessary to pass upon the validity of chapter 263, Priv. Acts 1937, since, independently of the latter act, we hold that the town of Fayetteville can lawfully issue and sell the bonds to prohibit which the bill herein was filed, that being its sole purpose.