STATE of Tennessee, Appellee,

v.

Luther Terry PRITCHETT, Appellant.

Supreme Court of Tennessee.

Aug. 3, 1981.

Rehearing Denied Sept. 21, 1981.

Jerry H. Summers, Sandra K. McCrea, Chattanooga, for appellant.

William M. Leech, Jr., Atty. Gen., Gordon W. Smith, Asst. Atty. Gen., Nashville, for appellee.

## OPINION

FONES, Justice.

This is a direct appeal, pursuant to T.C.A. § 39–2406, by defendant Luther Terry Pritchett of his conviction of murder in the first degree and the sentence of death. The jury found two statutory aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; and (2) the murder was committed while the defendant was engaged in committing robbery.

At the time of this murder defendant was living in a four room house on a one hundred and forty-six acre tract of land in Marion County located about "four and one half miles from the cross roads." The "cross roads" were apparently near the edge of the City of Jasper, Tennessee. Gene Day of Chattanooga owned the land and operated or intended to operate a game preserve thereon. Defendant was employed as a caretaker to feed and care for the birds, dogs, and cows and to work on the fences, etc. Mr. Day testified that he had intended to train defendant to operate the game preserve. The employment terms were rather indefinitely described. Defendant was entitled to live in the house rent free, and the utility bill was shared with Day. Defendant had lived on the property only a short time, the witnesses estimating three to six weeks, prior to the date of the murder and had received no pay from Mr. Day. Defendant was twenty-two years of age with a ninth grade education.

Frank Morrison, sixty-three years of age, lived in the City of Jasper and drove his own taxicab. He was killed by two twelve gauge shotgun blasts in the back of his neck about mid-afternoon on Saturday, February 24, 1979. His body was found by Sheriff's deputies in the driver's seat of his cab, the vehicle having been towed or pushed into a clump of trees on the Day property with Day's tractor. The cab was found about one quarter mile from the house in which defendant and his family resided, and it was obvious that the front of the vehicle had struck a tree.

Morrison was reported missing late Saturday night, and information obtained by the Sheriff's office on Sunday from another taxi driver that had been called by defendant caused the Sheriff and two of his deputies to go to the Day property to question defendant. When they arrived, Mr. Day and defendant were engaged in putting a new floor in a chicken house, assisted by Day's son and two other youths. Sheriff Hood called defendant aside and told him that he had information that defendant had "called Morrison out on a taxi run." Defendant admitted that he had called Morrison, but insisted that Morrison never did appear. Defendant was asked if he had any money and he responded by showing the Sheriff forty-five dollars. Sheriff Hood asked defendant if he had any more money in the house. Defendant replied in the negative and invited the Sheriff into the house to see for himself. As defendant escorted the Sheriff through the house, he pointed out an open closet in the dining room that contained a number of guns. Defendant remarked that this was "Mr. Day's closet."

Sheriff Hood returned to the chicken house and had a brief conversation with Mr. Day, whereupon the two deputies and Mr. Day drove off down a road on the property and a few minutes later called the Sheriff on the walkie-talkie and reported finding Morrison dead in his cab. Sheriff Hood immediately placed defendant under arrest and dispatched him to the Marion County Jail in a patrol car.

There was no attempt to interrogate defendant until approximately 8:10 p. m., Sunday evening, February 25, when TBI Agent Barbrow read him the *Miranda* warnings and obtained his written waiver of rights and agreement to submit to a taped interrogation.

The interrogation lasted approximately forty-five minutes. A hearing on defendant's motion to suppress the statement was held and overruled and that issue will be considered hereinafter.

In that statement defendant admitted that he called Morrison, ostensibly to take him to a feed store, but with the actual intent to rob him because he needed the money to buy groceries for his wife and child; that he had no intention of killing Morrison but intended, "to knock him in the head or something and take the money"; that when he got into the back seat of the cab to carry out that plan he panicked and pulled the trigger; that the cab was moving forward, he "bailed out" and the vehicle ran off the road and struck a pine tree.

Defendant testified at the trial and told a different story about his intentions and his motivation. He denied that he needed money or groceries or milk for his wife and child and denied that he had any intention of robbing Morrison. He testified that he took Mr. Day's shotgun to the barn, in case any hawks appeared and threatened Mr. Day's pheasants, while he was doing some clean up work at the barn. His wife was supposed to call Morrison out, and that after he had been at the barn about thirty minutes, he left the shotgun and went back towards the house to see if Morrison had arrived. As he approached the house, he saw Morrison and his wife in the front yard, "hugged up." He testified, "it flew all over me, and I said right then in my mind, I said if I had the shotgun I would kill both of them." He testified that he went back to the barn, but before he got there he decided, "she wasn't worth killing somebody over"; that while he was down there at the barn Morrison drove up and he got in the back seat of the cab with his shotgun. Defendant asked what Morrison and his wife

were doing "hugged up in the front yard," to which Morrison responded that, "it ain't none of your damn business." As Morrison leaned over in the front seat, defendant stated that, "I thought the man had a gun, and so that's when I shot him."

Defendant repeatedly insisted that he only remembered firing the shotgun one time. The murder weapon was shown by ballistics experts to be Mr. Day's Winchester pump shotgun model twelve, that required manual pumping to reject a spent shell and inject a second shell into the firing chamber. Defendant admitted in his statement that he used the Winchester pump shotgun. The pictures of the wounds and the testimony of the coroner and medical expert establish beyond question that two shotgun shells were fired into the back of Morrison's neck.

Defendant's explanation of the discrepancies between his statement on Sunday, February 25, and his trial testimony was that he had concocted the first version so as not to implicate his wife, so that, "there would be somebody with the baby." However, defendant's first statement clearly implicated his wife in the planning of the robbery and in assisting him with the tractor and harrow that were used to hide the cab and the body. The only material difference in his description of her activities in the two statements was that she and Morrison were "hugged up in the front yard."

Mrs. Edna Richardson owned and operated a grocery store where defendant purchased groceries. She delivered some milk and groceries to the Pritchett's on the Tuesday preceding the murder, following their telephone order on Monday night. Defendant did not have the money to pay for the groceries, but Mrs. Richardson left them anyway. On Wednesday, after six p. m., closing time for the grocery, Mrs. Richardson was at home. Defendant came to her back door and asked her to return to the store and get some groceries for his family. He had a silverplated .38 Colt pistol that he wanted Mrs. Richardson to hold until he paid for both the groceries he had already received and those he then wanted. Mrs.

Richardson told him she did not want the gun, but eventually took possession of it and defendant's mother-in-law came in the next morning and got some groceries.

The next time Mrs. Richardson saw defendant was Saturday afternoon about 6:20 p. m., a few hours after the murder. Defendant's wife called around closing time and asked if Mrs. Richardson would wait for them to come to the store. Defendant and his wife went to the store and told Mrs. Richardson that they were going to pay their grocery bill and redeem the pistol. They bought some groceries and paid her approximately thirty-eight dollars total and she gave defendant the pistol. Mr. Day identified the pistol as his property, kept in the gun closet in the house, along with three shotguns and two rifles, chain and skill saws, and numerous tools. Defendant admitted that he was expecting Mr. Day to come over from Chattanooga on Sunday, February 25, and that he probably would have been fired if Mr. Day knew that he had pawned the .38 Colt pistol.

In the statement given on February 25, 1979, defendant admitted taking nineteen to twenty-one half pints of whiskey, two watches, and two knives from Morrison's cab. When asked how much money he got, he responded, "he [Morrison] didn't have but thirty-four dollars I believe it was." Defendant insisted that the money and Morrison's billfold were just lying on the front seat. When Morrison was found, his trouser pockets were turned inside-out. Defendant did not retract any of those admissions during his in-court testimony.

Barbrow, the TBI Agent, found seventeen half pints of whiskey, four men's watches, a ring, and a billfold in the house occupied by defendant. Delbert Lee Goins identified one of the watches, the ring, and the billfold as items he had pawned to Morrison about ten days before the murder for three half pints of vodka.

## I.

◼ Defendant complains that his constitutional rights to due process and effective assistance of counsel were violated because the general sessions judge who presided at his preliminary hearing was not a licensed lawyer.

Defendant does not assert that his subsequent indictment, trial and conviction was in any way adversely affected by any defect in the preliminary hearing, but urges us to extend the Court's holding in *State ex rel. Anglin v. Mitchell*, 596 S.W.2d 779 (Tenn.1980), to require that all preliminary hearings be conducted by judges who are licensed lawyers. There are numerous distinctions between probable cause hearings and juvenile commitment proceedings, their consequences and subsequent procedures, and we are not convinced that any constitutional right of a defendant is violated by the mere fact that a presiding judge at a preliminary hearing is a non-lawyer. Parenthetically, defendant was represented at the preliminary hearing by two attorneys, one appointed and one retained "by the family." The transcript of the entire proceedings at the preliminary hearing is a part of the record in this cause and reveals that defendant had effective assistance of counsel and that there were no rulings by the presiding judge adverse to the defendant.

◼ Defendant presents an issue to the effect that the admission of the "confession" that resulted from the taped interrogation on Sunday, February 25, 1979, beginning at 8:10 p. m., violated his constitutional right to remain silent and was not freely and voluntarily given.

The State affirmatively proved that defendant was read and understood the full gammit of the *Miranda* rights, signed a written acknowledgement thereof and waiver of counsel, and agreed to permit the tape recording of the interrogation. That tape was played in open court, out of the presence of the jury. It began with TBI Agent Barbrow reciting that he had just read the *Miranda* warnings to defendant and obtained defendant's acknowledgement that he understood them and was freely and voluntarily waiving them. He also recited that a waiver statement had been

read to defendant which he had signed. Defendant acknowledged on the tape that all of these events had taken place and that he understood his rights and voluntarily waived them. After the tape was played in open court, with the trial judge and defense counsel comparing the accuracy of copies of a transcript of that tape provided by the District Attorney, the trial judge pronounced the tape clear and the transcript accurate. Defense counsel then informed the trial judge that they preferred to have the transcript of the taped interrogation read rather than have the tape played to the jury. The trial judge indulged their preference and only the transcript, with certain portions of questionable admissibility stricken, was presented to the jury. Sheriff Hood and Agent Barbrow testified that no promises were made to defendant, that no threats, pressure or coercion whatsoever was used, and that defendant was calm and not under the influence of alcohol or drugs.

■ Not one scintilla of evidence was produced on behalf of defendant to the effect that the statement was not freely and voluntarily given, and the issue presented here is without merit. The trial judge's ruling that the statement was freely and voluntarily given has the weight of a jury verdict in this Court if there is any material evidence to support it. *State v. Chandler*, 547 S.W.2d 918 (Tenn.1977).

■ Defendant asserts that the trial judge erred in failing to suppress the evidence resulting from the State's acquisition of the murder weapon, Mr. Day's Winchester shotgun.

At about 5:00 p. m., on Sunday, February 25, 1979, Mr. Day took the Winchester pump shotgun, another twelve gauge shotgun, and a pistol, all found in the gun closet inside the house on Mr. Day's property, and carried them out to Agent Barbrow's car, which was parked in front of the house. Barbrow gave Day a receipt for the two shotguns, took possession of them, and returned the pistol to Day.

The essence of defendant's position is that Barbrow used Day as the State's agent to conduct an illegal search, citing *Bays v. State*, 529 S.W.2d 58 (Tenn.Cr.App.1975). In *Bays*, one Ms. Green had secreted a stolen watch in the defendant's home. Defendant and his cohorts had robbed a woman in a parking lot and escaped in defendant's car, but were apprehended that same evening near defendant's home. Ms. Green voluntarily took one of the arresting officers into defendant's house, retrieved the watch, and gave it to the officer. Ms. Green did not reside at defendant's home nor did she have any possessory interest whatever therein. The Court of Criminal Appeals held that the *officer's* entrance into the Bay's home was an illegal intrusion.

At the time Mr. Day took the two shotguns that belonged to him from the gun closet and delivered them to Barbrow at his car, neither defendant nor his wife were present on the property belonging to Day. The record clearly establishes that all of the contents of the closet, guns and tools, belonged to Mr. Day and that he had reserved and in fact exercised the right of access to that closet when he was present on his property. Defendant's reference to the closet as "Mr. Day's" confirms that conclusion. Mr. Day had accompanied the deputies when Morrison's cab and body were found and had heard the Sheriff brief Agent Barbrow, who had just arrived on the scene, that the victim had been shot in the back of the neck with a shotgun or a large caliber pistol and that defendant had pointed out to the Sheriff a closet in the house containing several guns and some tools. Mr. Day described what occurred at that point as follows:

"Q. Now, let me ask you this, sir, did Agent Barbrow, Agent Bill Barbrow, did he make any request for the gun or guns in the closet?

A. Well, I told him I had some guns in the house, you know, in the closet.

Q. You told him that before he asked you, is that correct?

A. And he asked, you know, the kinds of them and all, and I told him, and I told him he was welcome to take

the guns providing he would, you know, give me a receipt for them, and then I went and got the guns and carried them to his car and he wrote me a receipt for everyone of them.

Q. All right, did you actually go in the house yourself and get the guns?

A. Yes, sir.

Q. Did anyone help you carry the guns out?

A. Not that I can recall. My son was there and he might have helped me carry one or two of them.

Q. And where did you take the guns, after you went and got the guns?

A. To the little driveway where the car was.

Q. All right. And where was Agent Barbrow when you brought the guns out of the house?

A. He was at his car."

We find no illegal entry by officers into the defendant's residence and nothing improper about Mr. Day's entry to obtain his own possessions and voluntarily turn them over to the officers.

▮ However, if we assume that the seizure of the Winchester pump shotgun was error, it was harmless error. Defendant's admission that he used that weapon to shoot Morrison rendered redundant the ballistic expert's testimony that the two spent shells found in the cab were fired from that shotgun.

Defendant also complains of two separate searches of the house that were conducted by officers with the consent of defendant's wife.

The first search occurred late Sunday afternoon, February 25, 1979. Barbrow drove from the house with the guns obtained from Mr. Day to the location of the cab and conducted an investigation of the crime scene. As he was completing that phase of the investigation, an officer told him that the Sheriff had sent a radio message requesting that Barbrow telephone the Sheriff's office. Barbrow returned to the Day house, where only Mr. Day was present, and obtained his permission to use the telephone. Sheriff Hood informed Barbrow that defendant's wife was being interviewed, and that she had consented to officers entering the house and obtaining articles that she had informed the Sheriff had been taken from Morrison's cab. In response to instructions which Barbrow received over the telephone from both Mrs. Pritchett and the Sheriff, he took possession of two knives in the bedroom, the seventeen half pints of whiskey, watches, a ring, army pants and white t-shirt in the kitchen, and a pair of scissors that were identified at trial as belonging to Morrison.

The second search occurred the next morning, Monday, February 26. In accord with arrangements made with Mrs. Pritchett Sunday evening, an officer picked her up at her mother's, where she had spent the night, and took her to the Day house, which she opened with a key she still had; she consented to and accompanied Sheriff Hood and Barbrow on a search of the house. The only evidence introduced as a result of that search was the billfold found under the center cushion of the couch that was identified as the property of Goins, pawned to Morrison.

▮ A wife can consent to the search of her home, and if objects are found which would incriminate her husband, such objects are admissible in evidence. *Bays v. State, supra; McCravey v. State*, 2 Tenn.Cr.App. 473, 455 S.W.2d 174 (1970); *Lester v. State*, 216 Tenn. 615, 393 S.W.2d 288 (1965); *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

▮ Again, it is clear that if both searches had been illegal, the errors would have been harmless. Defendant admitted that he took from Morrison at least thirty-four dollars, two watches, two knives, and nineteen to twenty-one half pints of whiskey. The additional items obtained in the two searches were of no real significance, nor was the testimony of the serologist, who stated that blood stains on the t-shirt and fatigues contained two enzymes found in Morrison's blood that are also found in

the blood of seventeen percent of the population.

No charges were ever placed against Mrs. Pritchett and she was never placed under arrest. Conceding that she was in custody at the time she consented to the first search, that fact does not render the consent invalid as a matter of law. See Annotation 9 A.L.R.3d 858, 873 (1966). Sheriff Hood testified that Mrs. Pritchett's consent was voluntary, and she was not subjected to any threats or coercion and no evidence to the contrary was introduced.

Defendant contends that his constitutional rights were violated when jurors Tate, Curington, and Slaughter were excused for cause, "merely upon the ground that [they had] conscientious objections to capital punishment."

Defendant says that *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) limits the holding of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), so that jurors can only be barred from jury service on the basis of, "inability to follow the law or abide by their oaths." Perhaps so, but we are of the opinion that the answers of the jurors in question justified the conclusion that each possessed an "inability to follow the law." *See Houston v. State*, 593 S.W.2d 267 (Tenn. 1980), cert. denied 449 U.S. 891, 101 S.Ct. 251, 66 L.Ed.2d 117 (1980).

Defendant claims that the trial judge erred in permitting the State to ask defendant on cross examination if he intended to rob Ms. Quarles, a taxi driver, that he called to come out to his residence the day before the murder.

Defendant gives three citations to the trial transcript where it is asserted the improper questions were asked. No objection was made by defense counsel in either instance. Without contemporaneous objection, the error, if any, is waived. *State v. Sutton*, 562 S.W.2d 820 (Tenn.1978).

Defendant had testified on direct examination that Morrison had not been called for the purpose of robbing him. This was contrary to the statement defendant gave on February 25. The State had a legitimate objective in seeking to determine defendant's purpose in calling taxi driver Ms. Quarles out to their remote residence the day before. Defendant had said, on February 25, that Danny Sailors was at the Day property on February 23, and that he had called Ms. Quarles because Sailors wanted a cab; that when the cab arrived, Sailors was hiding in the barn and he rode with Ms. Quarles to the barn and called Sailors but he would not come out. At trial, on direct examination, defendant testified that Danny Sailors had never been on the Day property; that he had said that to Ms. Quarles so defendant would not have to pay the taxi bill for her trip out there. This background presented a situation suggesting that defendant may have called Ms. Quarles for the purpose of robbing her, and such evidence would have been admissible as tending to show a common scheme or plan for the commission of two or more crimes related to the crime on trial. *See Collard v. State*, 526 S.W.2d 112 (Tenn. 1975). We have read the cross examination with care and find in each of the three instances cited the questioning was in a different and legitimate context in recounting the defendant's conflicting versions of the Sailors—Quarles incident. We are of the opinion that no error was committed in the cross examination of defendant and hold that the issue has no merit.

Defendant claims that the State was allowed to ask defendant two questions on cross examination and to argue to the jury that the State could not call defendant's wife as a witness, in violation of the marital privilege, to defendant's prejudice.

Defendant testified on cross examination that he "concocted" the version on February 25, insofar as the motive and purpose in calling Morrison's taxi, to protect his wife from involvement. The State had voluntarily stricken from the transcript of the February 25 interrogation a question by Barbrow asking what defendant's wife had to do with the crime and defendant's answer. During cross examination at the trial, the

prosecutor first asked the trial judge for a ruling on whether that question and answer was admissible in view of defendant's trial testimony and obtained a favorable ruling, with no contemporaneous objection by the defense. Whereupon the following transpired:

"Q. Question: All right. You were asked by this TBI Agent Barbrow, 'Tell us what your wife had to do with it,' and your answer, 'Well she just kept calling me chicken, calling me chicken, and I said, I told her, I said, you'll just have to call me a chicken, that's what I told her.' Question: 'She was calling you chicken to do what now?' Barbrow asked you. And you say, answer: 'To kill Mr. Morrison.' Did you not make that statement?

A. I told that but that was just in the story that I had sat on that couch that Saturday night and made up.

Q. And yet, you tell this jury today that you made the statement on the night of the twenty-fifth, to protect your wife?

A. That's true.

Q. You are charging your wife in this statement, aren't you?

A. Well, I didn't see it that way."

Next, defendant complains of error because the prosecutor asked defendant if he intended to call his wife as a witness, and because he argued to the jury that the State could not call defendant's wife as a witness.

■■■ The marital privilege prohibits both husband and wife from *testifying* in criminal cases as to any matter coming to his or her knowledge by reason of the marital relation. Neither of these instances involve defendant's or his wife's testifying. Both are marginal as to propriety, but no contemporaneous objection was made and we find no prejudice resulted from these incidents.

■■■ Defendant contends that the relevant statutes relating to the death penalty are unconstitutional due to certain legislative procedural infirmities in the methods in which the corresponding bills were passed in the House and Senate. Defendant phrases this issue as follows:

"Whether §§ 39–2402, 39–2404, 39–2407, and 39–2496 [sic (29–2406)] are unconstitutional in that the failure of each house of the Tennessee Legislature to read and pass, on three separate days, T.C.A. 6639–2402, 39–2404, 39–2407 and 39–2496 [sic (39–2406)] and the failure of the respective speakers of each house of the Tennessee Legislature to sign in open session these sections of T.C.A. renders the sections in violation of Article II, Section 18 of the Tennessee Constitution as it existed at the time these sections became law."

Defendant also specifically alleges that the appropriate Senate Bill was not passed upon its second reading and that the House Journal affirmatively shows that the "Tennessee Death Penalty Act" was not passed in conformance with Article II, § 18 of the Tennessee Constitution. We find these contentions to be without merit.

The above mentioned code sections were all amended to their present form [T.C.A. § 39–2402(c) was subsequently added by 1979 Pub.Acts, ch. 318, § 4] by the 90th General Assembly of the Tennessee Legislature by means of 1977 Tenn.Pub.Acts, ch. 51. This Act corresponds to Senate Bill No. 82. The Act reveals that it was passed by both the House and Senate on March 30, 1977, and signed by the Speakers of both houses. Over the Governor's veto, Senate Bill No. 82 was again approved by both the Senate and the House on April 11, 1977. We find nothing in either the House or Senate Journals indicating that the passage of Senate Bill No. 82 was not in compliance with Article II, § 18 of the Tennessee Constitution. The two Journals indicate that in fact, passage of this Bill was performed in complete accordance with that constitutional provision.

Article II, § 18, prior to its amendments in 1978, stated as follows:

"Every bill shall be read once, on three different days, and be passed each time in the House where it originated, before transmission to the other. No bill shall become a law, until it shall have been

read and passed, on three different days in each house, and shall have received, on its final passage in each house, the assent of a majority of all the members, to which that house shall be entitled under this constitution; and shall have been signed by the respective speakers in open session, the fact of such signing to be noted on the Journal; and shall have received the approval of the Governor, or shall have been otherwise passed under the provisions of this constitution."

Turning to defendant's first argument, that Senate Bill No. 82 was not passed on its second reading, we find this assertion unsupported by the Senate Journal. The Journal reveals that Senate Bill No. 82 passed its second reading on February 24, 1977. *See* 1977 Senate Journal at 62. The Journal also indicates that this Bill passed its first reading on February 22, *id.* at 50, and its third reading on March 23, *id.* at 275–80. We thus find that the Bill proceeded through the Senate in accordance with the Tennessee Constitution as it read in 1977.

We further find that the House Bill No. 59, which corresponded to Senate Bill No. 82, proceeded properly through the House. That Bill passed its first reading on February 23, 1977. *See* 1977 House Journal, Vol. I, at 62. It passed its second reading on February 24, *id.* at 70, and its third reading on March 30, 1977, *id.* at 434–40. Also on March 30, House Bill No. 59 was made to conform with Senate Bill No. 82 and the Senate Bill Number was substituted for that of the House Bill Number 59. *Id.* at 434.

Our understanding of defendant's next contention is that the House Journal fails to reflect that the Speaker of the House signed Senate Bill No. 82 after the passage of its third and final reading on March 30. Again we find this contention unsupported by a reference to the House Journal.

The Index of Legislative Action found on page 1670 of 1977 House Journal, Vol. II, under House Bill No. 59, fails to list a reference to any page number in the Journal indicating the Signature of this Bill by the Speaker of the House. This is an apparent oversight that may have led to defendant's assertion that there was no such record of this signature found in the House Journal.

The Senate Journal, however, indicates that on April 6, 1977, the acting clerk of the House reported to the Speaker of the Senate that he was returning Senate Bill No. 82 signed by the Speaker of the House. *See* 1977 Senate Journal, at 510. Common sense would indicate that the Speaker of the House must have signed this Bill at some time between March 30, 1977, and April 6, 1977. A perusal of the days in question in the House Journal indicates that, indeed, on April 4, 1977, Senate Bill No. 82 was signed by the Speaker of the House. *See* 1977 House Journal, Vol. I at 566. The Speaker of the Senate signed Senate Bill No. 82 on this same day. *See* 1977 Senate Journal at 506.

Thus we find that 1977 Public Acts, ch. 51, proceeded through both the House and Senate in accordance with the mandates of Art. II, § 18 as it read in 1977. Defendant's contentions to the contrary are without merit.

II.

Defendant has launched a two-pronged attack on T.C.A. § 39–2404(i)(5), the aggravating circumstance that, the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind. First, defendant says that the aggravating circumstance is constitutionally infirm because of vagueness, and second that if constitutional, the circumstances of this homicide did not support of finding that the victim was tortured or that the defendant's acts evinced depravity of mind. He relies upon *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

The Georgia aggravating circumstance under consideration in *Godfrey* required that the murder, be "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." Georgia Code Annotated § 27–2534.1(b)(7).

In *Godfrey* the United States Supreme Court found that there was nothing in the record to support a finding that the victims had been tortured or that defendant's acts involved depravity of mind.

Godfrey's wife of twenty-eight years had filed suit for divorce and was living with her mother in a trailer. Godfrey's efforts at reconciliation were rebuffed and he believed that his mother-in-law was largely responsible for his wife's determination not to reconcile. Following a heated telephone conversation with his wife wherein she was firmly opposed to reconciliation and was demanding all the proceeds of the sale of their home, he got out his shotgun and proceeded to the trailer. Looking through a window, he saw his wife, his mother-in-law, and his eleven year old daughter playing a card game. He fired his shotgun through the window killing his wife instantly, entered the trailer, struck his daughter with the barrel of the gun, and shot his mother-in-law, killing her instantly.

The United States Supreme Court repeated its earlier admonitions in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) and *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), that a capital sentencing scheme must provide a meaningful basis for distinguishing the few cases in which the death penalty is imposed from the many cases in which it is not; that if a state wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. The Court also admonished that while it had held the Georgia section (b)(7) aggravating circumstance to be facially constitutional in *Gregg*, it had clearly implied that if given an "open-ended construction," it would not pass muster.

The United States Supreme Court noted that the Georgia Supreme Court in *Harris v. State*, 237 Ga. 718, 230 S.E.2d 1 (1976), and *Blake v. State*, 239 Ga. 292, 236 S.E.2d 637 (1977), had interpreted its section (b)(7), aggravating circumstance, and reached these conclusions: (1) the evidence that the offense was outrageously or wantonly vile, horrible or inhuman, had to demonstrate torture, depravity of mind or an aggravated battery to the victim; (2) the phrase "depravity of mind" comprehended only the kind of mental state that led the murderer to torture or to commit an aggravated battery before killing his victim; (3) torture must be considered in pari materia with aggravated battery so as to require evidence of serious physical abuse of the victim before death.

The United States Supreme Court found that under the facts in *Godfrey* the Georgia Supreme Court had failed to apply those limitations. The Court said:

"The Georgia courts did not, however, so limit § (b)(7) in the present case. No claim was made, and nothing in the record before us suggests, that the petitioner committed an aggravated battery upon his wife or mother-in-law or, in fact, caused either of them to suffer any physical injury preceding their deaths. Moreover, in the trial court, the prosecutor repeatedly told the jury—and the trial judge wrote in his sentencing report—that the murders did not involved 'torture.' Nothing said on appeal by the Georgia Supreme Court indicates that it took a different view of the evidence. The circumstances of this case, therefore, do not satisfy the criteria laid out by the Georgia Supreme Court itself in the *Harris* and *Blake* cases. In holding that the evidence supported the jury's § (b)(7) finding, the State Supreme Court simply asserted that the verdict was 'factually substantiated.'

Thus, the validity of the petitioner's death sentences turns on whether, in light of the facts and circumstances of the murders that Godfrey was convicted of committing, the Georgia Supreme Court can be said to have applied a constitutional construction of the phrase 'outrageously or wantonly vile, horrible or inhuman in that [they] involved . . . depravity of mind. . . .' We conclude that the answer must be no. The petitioner's crimes cannot be said to have

reflected a consciousness materially more 'depraved' than that of any person guilty of murder. His victims were killed instantaneously. They were members of his family who were causing him extreme emotional trauma. Shortly after the killings, he acknowledged his responsibility and the heinous nature of his crimes. These factors certainly did not remove the criminality from the petitioner's acts. But, as was said in *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393, it 'is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.'

That cannot be said here." 100 S.Ct. at 1767, 64 L.Ed.2d at 409.

■ Although the Tennessee aggravating circumstances, T.C.A. § 39–2404(i)(5), does not contain the phrase, "an aggravated battery to the victim" it is clear that a constitutional construction of this aggravating circumstance requires evidence that the defendant inflicted torture on the victim before death or that defendant committed acts evincing a depraved state of mind; that the depraved state of mind or the torture inflicted must meet the test of heinous, atrocious, or cruel.

■ In the case before us the evidence is inescapable that Morrison's death was instantaneous from the first gunshot shell that was fired. Thus, the firing of the second shot did not inflict torture or physical abuse upon the victim before death.

In the face of the finding by the United States Supreme Court in *Godfrey* that the evidence of Godfrey's acts did not, "reflect a consciousness materially more depraved than that of any person guilty of murder," we must find as a matter of law that Pritchett's acts fail to show a depraved state of mind. The necessity of that finding becomes readily apparent upon considering the circumstances of Godfrey's murder of his mother-in-law. As she sat across the card table from her daughter she saw her killed instantly by a shotgun blast through the window of the trailer. That blast made a large hole entering one side of her daughter's head and a larger hole exiting on the other side. She saw defendant enter the trailer, strike and injure her eleven year old granddaughter, and for at least fleeting seconds faced the realization that defendant intended the same fate for her that he had inflicted upon his wife.

The only aspect of the murder in this case that may be said to distinguish it from a routine murder was the firing of the second shotgun blast into the back of Morrison's neck after pumping out the spent shell and pumping in a live shell. Such depravity as that may evince falls short of that exhibited by Godfrey, in our opinion.

■ In the case of *State v. Moore*, 614 S.W.2d 348 (Tenn.1981), we found the proof insufficient to support one of two aggravating circumstances found by the jury. In that circumstance we held that it was necessary to set aside the death penalty and remand to the trial court for the purpose of conducting a new sentencing hearing. Similarly, we have no way of knowing and cannot speculate whether the jury would have imposed the death penalty with one of the two aggravating circumstances withdrawn from their consideration and with the necessity of weighing the one remaining aggravating circumstance against the mitigating circumstances.

■ Defendant contends that the other aggravating circumstance, T.C.A. § 39–2404(i)(7),[1] is vague and overbroad on its face and has the effect of establishing a mandatory sentence of death; that it requires imposition of the death penalty even in the absence of premeditation and that it is impermissible to use a felony to establish that a murder was first degree murder and

---

1. T.C.A. § 39–2404(i)(7) reads as follows: "The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb."

then use it as an aggravating circumstance to impose the death penalty.

Defendant's argument that the statute is vague and overbroad and has the effect of establishing a mandatory sentence of death is based upon lifting the following situation from the statute: "The murder was committed while the defendant was engaged in committing ... any first degree murder ...." Defendant correctly observes that every first degree murder is committed while engaged in committing first degree murder. We agree that if applied as applicable to the single murder for which the defendant was then being tried, that portion of the subsection would be unconstitutional. However, we are confident that the Legislature intended that use, as an aggravating circumstance, of the crime of first degree murder listed in subsection (i)(7) would be limited to the murder or attempted murder, etc. of another person or persons while committing or attempting to commit, etc. the murder of the victim involved in the crime on trial. That is the way that this Court construes the subsection and so construed, we are of the opinion that it is constitutional. *See Tennessee Electric Power Co. v. Mayor and Aldermen of Town of Fayetteville*, 173 Tenn. 111, 114 S.W.2d 811 (1938).

As we have indicated, it will be necessary to remand this case for a resentencing hearing where only the aggravating circumstance prescribed in T.C.A. § 39–2404(i)(7) will be submitted to the jury. In *State v. Moore, supra*, we held that the trial judge must charge the statutory definition of the felony or felonies the State relies upon as invoking subsection (i)(7). Of course, implicit in that holding is the requirement that the evidence in the case must justify that submission. In this case, we note that the trial judge read to the jury T.C.A. § 39–2404(i)(7) in its entirety as it appears in the Code, including every felony listed therein. The only felony listed in that subsection, of which there was evidence in the record to support, was that of robbery. Upon retrial the trial judge should charge that aggravating circumstance as follows:

"The murder was committed while defendant was engaged in committing, or was attempting to commit robbery. Robbery is the felonious and forcible taking from the person of another, goods or money of any value, by violence or putting the person in fear."

Issues numbered fifteen, seventeen, and nineteen in the defendant's brief are rendered moot because of our rulings with respect to the aggravating circumstances and the necessity of remand for resentencing.

■ Defendant argues that the aggravating circumstance in subsection (i)(7) will result in imposition of the death penalty in the absence of premeditation and in cases involving the least, rather than the most "blameworthy" of murderers, because, it is insisted, the statute contains no guidelines for ascertaining culpability or the degree of culpability that will prevent disproportionate application of the death penalty. The short answer to the issue posed by defendant is that, conceding such a result may be possible in the trial court, it is the statutory and inherent obligation of this Court to correct the error on appeal. An integral part of the death penalty statute that must be construed in pari materia is the automatic review of every death sentence by this Court. T.C.A. § 39–2406. Subsection (c) of that statute enumerates our duties that include eliminating any arbitrary, excessive, or disproportionate imposition of the death penalty. Thus, subsection (i)(7) is facially constitutional and this Court will see that it is applied constitutionally, case by case.

■ Next, defendant insists that subsection (i)(7) cannot be used as an aggravating circumstance in this case because the felony of robbery may have been used by the jury to establish that the murder was murder in the first degree, relying upon *State v. Cherry*, 257 S.E.2d 551 (N.C.1979). The Supreme Court of North Carolina held in *Cherry* that once the underlying felony had been used to obtain a conviction of first degree murder, it has become an element of that crime and may not thereafter be the basis for additional prosecution or sentence.

With all due respect to our sister state's highest court, we are not bound nor inclined to follow that reasoning or result. In our opinion, the United States Supreme Court has implicitly approved an identical application of the felony of robbery committed as a part of the act of murder as a valid aggravating circumstance to support the imposition of the death penalty. *See Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Until that Court instructs otherwise, we reject defendant's argument that the underlying felony cannot be used as an aggravating circumstance.

■ Defendant presents an issue asserting the sentencing statute to be unconstitutional because it allows the admission of hearsay evidence. Defendant cannot raise that issue as no hearsay evidence was introduced at his sentencing hearing. *See Houston v. State*, 593 S.W.2d 267, 277–78 (Tenn. 1980). The only evidence introduced by the State was a photograph of the deceased showing the two wounds in his neck, relevant only to the aggravating circumstance we have found not applicable to this case as a matter of law.

■ Next, defendant says that T.C.A. § 39–2404(f) and (g) are unconstitutional because of the failure to designate who has the burden of proof and the standard of proof necessary for determining whether the aggravating circumstances outweigh the mitigating circumstances. A similar contention was considered and rejected in *Houston v. State, supra.*

■ Defendant asserts that T.C.A. § 39–2404(h) is unconstitutional because it prohibits the jury from being informed of the consequences of its failure to reach a unanimous verdict at the sentencing phase of the trial. A similar contention was considered and rejected in *Houston v. State, supra.*

The remaining issues urged upon the Court in defendant's brief attacking the

constitutionality of the death penalty and the sentencing statutes have been considered and rejected in prior opinions of this Court, and we do not deem that these issues warrant further discussion here.[2]

■ We pretermit the issue raised by the State with respect to the timeliness of defendant's motion for a new trial and the effect thereof upon the jurisdiction of this Court to consider anything other than the sentencing phase of the trial. In this connection, we do not agree with *Massey v. State*, 592 S.W.2d 333, 334 (Tenn.Cr.App. 1979), with respect to loss of jurisdiction for failure to comply with the time requirements of Tennessee Rules of Criminal Procedure 33(b). *See State v. Givhan*, 616 S.W.2d 612 (Tenn.Cr.App.1980), wherein *Massey* is appropriately modified.

■ We find that no prejudicial error was committed at the guilt phase of the trial and that the evidence of defendant's guilt of first degree murder is such that any rational trier of fact could find that guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). T.R.A.P. 13(e).

This case is remanded to the trial court for a resentencing hearing in accord with the rulings herein.

HARBISON, C. J., and COOPER and DROWOTA, JJ., concur.

BROCK, J., concurs in part, dissents in part, see separate opinion.

BROCK, Justice, concurring in part and dissenting in part.

I would hold that the death penalty is invalid for the reasons stated in my dissent in *State v. Dicks*, Tenn., 615 S.W.2d 126, 132 (1981), but I concur in all other aspects of the opinion of the Court.

---

**2.** An attack on the death penalty as cruel and inhuman punishment was fully considered and rejected in *State v. Dicks*, 615 S.W.2d 126 (Tenn.1981). An attack upon Rule 47 and this Court's procedures in determining whether the death sentence is disproportionate was considered and rejected in *State v. Groseclose, et al.*, 615 S.W.2d 142 (Tenn.1981). *See also Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

OPINION ON PETITION TO REHEAR

PER CURIAM.

The petition to rehear filed by Luther Terry Pritchett, has been considered by the Court and found to be without merit. It is, therefore, respectfully denied at appellant's cost.