IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 10, 2006

## STATE OF TENNESSEE v. EDNA PHELPS

**Direct Appeal from the Circuit Court for Madison County**
**No. 04-649     Roger A. Page, Judge**

_____

**No. W2005-00943-CCA-R3-CD  - Filed February 22, 2006**

_____

The defendant, Edna Phelps, was found guilty by a Madison County jury of aggravated assault, a Class C felony, and was sentenced as a Range I, standard offender to four years, all suspended except for eleven months and twenty-nine days with the balance to be served on intensive probation.  On appeal, she argues the trial court erred in overruling her objections to certain questions asked by the State.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

George Morton Googe, District Public Defender, and David H. Crichton, Assistant Public Defender, for the appellant, Edna Phelps.

Paul G. Summers, Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General; James G. Woodall, District Attorney General; and James W. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The defendant's conviction is the result of a physical altercation between the defendant and her sister, Fatina Phelps,[1] that took place outside their mother's residence on April 18, 2004.  The defendant's mother, Malvon Phelps, testified that on the day in question, her daughters "got to fighting."  Malvon explained that the incident initially began inside the house, when the sisters

---

[1]Most of the witnesses are related to each other and, consequently, have the same last name.  We will, therefore, utilize their first names in referring to them.  We intend no disrespect by this procedure but do so to avoid continually repeating the full names of the witnesses.

started "wrestling and fighting." Malvon then saw the defendant go into the kitchen and open and shut a "drawer right quick" but did not see the defendant take anything. The sibling squabble eventually moved outside where, although she did not observe the actual fight, Malvon "saw [the defendant] with the knife." Malvon retrieved the knife from the defendant and placed it back in the kitchen drawer before handing it over to the police. On cross-examination, Malvon acknowledged that the defendant's finger was bleeding and that the defendant told her Fatina "had bit her."

Officers James Avery and Michael Brockmeyer, both with the Jackson Police Department, testified. Avery said that when he arrived on the scene, he was told there had been a fight between the defendant and Fatina. The officer asked for the knife that was used and Malvon gave him a "serrated kitchen knife." Avery said Fatina had a cut on her left forearm, which he photographed. Officer Brockmeyer said that he took a photograph of the defendant's fingers, which had been bitten.

Melvon Givens, the defendant's elderly aunt, testified that she was at her twin sister Malvon's house for Sunday dinner when the defendant asked her to go to the defendant's home. Givens declined and the defendant went home by herself. Upon the defendant's return, she demanded that Givens return home with her and the next thing Givens knew "[t]hat was really it" and the defendant "grabbed [her] and everything." Givens said Fatina and Malvon had to separate them. Givens testified that she did not witness the fight between Fatina and the defendant that took place outside.

Kenneth Phelps, the defendant's brother, testified that on the day his sisters were fighting, he was "in [his] own room . . . minding [his] own business" when his "mother called [him] in there to hold [his] oldest sister [the defendant] until . . . something stopped." Asked why he was holding the defendant, Kenneth said he "had no idea." Kenneth held the defendant until his "mother finally told [him] to turn her loose."

Fatina Phelps, the defendant's sister and the victim, testified that she and her aunt, Melvon Givens, were sitting on her mother's couch when the defendant came in "eating a bag of Cheetos" and "started staring at" Givens. Fatina said that the defendant then decided to go home and demanded that Givens accompany her. Givens declined the invitation and the defendant left alone, telling Fatina and Givens that they "better not be there when she got back." When the defendant returned, she started "cussing" at Givens and telling her that she "was going to come over to [Fatina's] house² and she was going to get [Givens] whenever she so desired." Fatina responded by telling the defendant that she could not get Givens any time she wanted, and then, as Fatina explained, the following happened:

> I saw her swing at my aunt, and that happened shortly -- well, right after the statement I just made. When I said, "No, ma'am, you won't be able to come over to my house and pick [Givens] up whenever you want to and take her wherever and

---

²Givens moved in with Fatina in October of 2003. Fatina had "the power of attorney, financial and healthcare power of attorney" over Givens.

keep her as long as you want to," she approached me and I didn't know what she was, you know -- She was coming at me so I stood up.

And then she backed me up over the TV. The TV was sitting right next to a window to my left, and I backed up over the TV. And she was in my -- she invaded my personal space.

And she said -- She spit Cheetos. She was eating a bag of Cheetos, as I said. She had a mouthful of those. She spit all those in my face and she said, "Come on. Come on."

. . . .

She said, "Come on, bitch. Now what you [sic] going to do?"

She said she was going to beat my ass and it was going to be all right for her to come over to my house and get [Givens] when she got through beating my ass.

And so when she spit the Cheetos in my face I said, "You have spit Cheetos all over my face." I said, "You have invaded my personal space. Would you please step back out of my personal space?"

And, again, she spit on me again. She spit those Cheetos in my face and she said, "It's going to be all right." She said it's going to be all right because she's going to do whatever she's going to do to me.

She said I was no kin to her, she was going to beat my ass, and she said she was going to kill me and that she hated me. And I don't know if that's the exact order of what she was saying, but those are the words that she said.

And I asked again asked her the second time, "Would you please step back out of my personal space?" I said -- I told her, I said, "Your breath is funky," because, you know, it was all over -- the Cheetos was on me. I was trying to get that off and, you know, she was just on me.

And she said she wasn't going to move back out of my personal space and that she was going to beat [Givens'] ass.

So she turned sideways and she swung in a downward motion trying to strike my aunt, you know, like going down in that direction.

My aunt had the presence of mind to step back. When she took one step backwards the lick did not connect. And once the lick went down she turned back

towards me in my face and she was coming with a lick. Well, you know, there was several licks passed, because I defended [Givens] and I defended myself.

Fatina said her mother, Malvon, came in and said, "Y'all stop," but the defendant refused and continued "swinging" at her and "several licks was [sic] passed" between the two. The defendant broke Fatina's glasses and put "several scratches" on her face. Malvon yelled for her son, Jerry Scott, to help stop the fight. Scott stepped between his sisters and held onto the defendant while Fatina "backed off of [the defendant]" and took Givens into the kitchen "to try to diffuse the situation." Fatina said she decided to leave with Givens and while they were "trying to get away," Fatina heard her mother scream "real loud" and then the following happened:

> I turned around to see . . . who was screaming and why they was [sic] screaming. When I turned around [the defendant] was over me with a butcher knife and she was getting ready to go down like that (indicating). And I just had a split second to throw my arm up like this.

> When I put my arm up like that to keep her from messing my face up or whatever she was doing, she cut my arm. And I have the scratches. . . .

> And when I did this, she started making stab motions like she was going to stab me in the abdomen, the midsection.

Fatina said her mother then got the knife from the defendant and told the defendant to "[g]et [her] ass back in the house." Concerned about her safety, Fatina grabbed a hammer out of a toolbox because she "didn't want to die that day." Fatina then went to the police station to report the assault. She acknowledged telling the police that if the defendant "stuck her finger in my mouth, you know, as tense and scared as I was, I'm sure I clamped down on her fingers."

The defendant testified that, on the day of the fight, she asked Givens if she would like to come to her house to see her dogs. Although Givens initially told her yes, when it was time to leave, she declined to go and Fatina told the defendant that Givens was "not going nowhere with [her]" and called the defendant "a B-word." The defendant went home alone and, after returning to her mother's house, told Givens that she could have come home with her if she had wanted. The defendant said Fatina then started calling her "the B-word" again and the following fight ensued:

> And I got up. I stood up and I called [Fatina] the B-word back. She blew a breath in my face, and then I just stood there and looked at her. I blew back, which I didn't have no Cheetos eating then because I had finish[ed] eating the Cheetos before I had left.

> When she blew on me the second time and I blew back on her she raised her hand and hit me upside my face on the left side of my face. And when she hit me on my face I proceeded to hit her back.

-4-

She grabbed my hand and we swung around on the sofa. She swung me around on the sofa.

She grabbed my hand and bit my finger right here almost to the bone.

The defendant said her mother and brothers came in and broke up the fight. She said Fatina then went into the kitchen, retrieved a knife, and went outside with their aunt. The defendant watched as Fatina retrieved a hammer from the toolbox outside. In response to Fatina having "the hammer and the knife in her hand," the defendant went into the kitchen "to get something to defend [herself]." When Fatina attempted to come back inside the house, the defendant:

. . . ran to the front door, the front screen door and pushed it and pushed it open.

And when I pushed it open I stumbled and we [the defendant and Fatina] both fell out. She was on . . . the outside of the door. She fell back and I fell out the door. And when I came -- and when I fell out the door and I got my composure together and got up, she swung the hammer at me.

And when she swung the hammer I sw[u]ng the knife and cut her on the arm because my finger was still bleeding from where she had bit it.

The defendant said her mother then asked her for the knife and she gave it to her.

On cross-examination, the defendant denied spitting Cheetos in Fatina's face. She also claimed that her mother, her aunt, and Fatina were untruthful during their testimony.

## ANALYSIS

On appeal, the defendant argues that the trial court "erred in overruling [d]efendant's objection to the prosecutor's continuing questioning of the [d]efendant regarding whether other witnesses had 'lied' in their testimony" because such questions did not produce relevant evidence. The State responds that the defendant waived this issue because no contemporaneous objection was made to the questions. We agree with the State.

We will set out the testimony which is the basis for the sole issue on appeal. In cross-examination, the State questioned the defendant:

Q      Okay. So [Givens] wasn't telling the truth about that; is that right?

A      No, she wasn't.

Q       So your aunt lied when she indicated that she said she didn't want to go. Your aunt was not telling the truth; is that what you're saying?

Later in the questioning, the State asked the defendant:

Q       So your sister lied again?

A       Yes, she did.

. . . .

Q       Your aunt lied?

A       Yes, she did.

Q       Your mom lied?

A       Yes, she did.

Q       And your sister lied?

A       Yes.

Q       Everybody is ganging up on you?

A       Yeah.  I don't know why.

At no time during these exchanges did defense counsel object.  It was not until later when the State asked the defendant whether her brother, Kenneth, had been untruthful in his testimony that defense counsel made the following objection:  "Your Honor, I'm sorry.  I've let this go on. There's -- What's the relevance as to her, you know -- There's no relevance as to her and how she characterizes everyone else's testimony.  They're all telling different stories.  How she characterizes it is not relevant."

The defendant's failure to object contemporaneously to the State's questions constitutes a waiver.  See Tenn. R. App. P. 36(a), Advisory Commission Cmts. ("The last sentence of this rule is a statement of the accepted principle that a party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error."); see also State v. Pritchett, 621 S.W.2d 127, 135 (Tenn. 1981) (citing State v. Sutton, 562 S.W.2d 820 (Tenn. 1978)) (explaining that "[w]ithout contemporaneous objection [to improper questions], the error, if any, is waived").  The defendant allowed the State to ask numerous questions, without objection, about whether the defendant thought three witnesses had been untruthful.  The defendant then attempted to make an overall objection to the questions when asked about the veracity of a

-6-

fourth witness.  This, the defendant cannot do.  <u>See</u> <u>Hill v. State</u>, 513 S.W.2d 142, 143 (Tenn. Crim. App. 1974) (stating that to allow evidentiary questions to be raised at any time would "undercut the very function of the trial process, for it would become a tactical matter of defense to allow a bit of constitutionally inadmissable evidence into the record, in the hope for an acquittal but secure in the knowledge that a new trial would result").

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____

ALAN E. GLENN, JUDGE