**STATE of Tennessee, Appellee,**

v.

**Vernon F. COOPER, Appellant.**

Supreme Court of Tennessee,
at Knoxville.

Oct. 14, 1986.

---

W.J. Michael Cody, Atty. Gen. and Reporter, Gordon W. Smith, Asst. Atty. Gen., Nashville, for appellee.

Rodney Strong, Chattanooga, for appellant.

OPINION

HARBISON, Justice.

Appellant was convicted of murder in the first degree as a result of the deliberate and planned shooting of his estranged wife. He was sentenced to death by electrocution. We affirm the judgment and the sentence.

There is very little dispute as to the material facts in this case. Appellant does not question the sufficiency of the evidence of his guilt of murder in the first degree. He shot his wife four times with a pump shotgun at her place of employment, a self-service gasoline station, at midday in the presence of numerous witnesses. He fled from the scene in his automobile and was apprehended only after a dangerous and high-speed pursuit through heavy traffic. His own testimony revealed that the homicide was the result of careful and deliberate planning on his part after having warned his estranged wife and her family of his intentions.

Only one major issue is presented on appeal [1].

The aggravating circumstance relied upon by the prosecution and found by the jury to warrant the death penalty was:

"The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; ..." T.C.A. § 39–2–203(i)(5).

Although appellant apparently concedes that the evidence was sufficient to warrant a conviction of murder in the first degree, it is his insistence on appeal that the evidence in support of this aggravating circumstance was not sufficient to outweigh the mitigating circumstances upon which he relied, these being the absence of a history of prior criminal activity and that the homicide was committed while he was

---

[1]. In a second issue, counsel for appellant has questioned the validity of the death penalty, but each of the contentions made in that regard has repeatedly been considered by this Court and need not be further discussed here. *See State v. Caldwell,* 671 S.W.2d 459, 466 (Tenn.1984), *cert. denied,* 469 U.S. 873, 105 S.Ct. 231, 83 L.Ed.2d 160 (1984); *State v. Laney,* 654 S.W.2d 383, 389 (Tenn.1983), *cert. denied,* 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699 (1983); *State v. Austin,* 618 S.W.2d 738, 741 (Tenn.1981) *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981).

under the influence of extreme mental or emotional disturbance. T.C.A. § 39–2–203(j)(1) and (2). He further insists that as a matter of law the evidence was insufficient to warrant a finding that the homicide was in fact especially heinous, atrocious or cruel so as to distinguish it from other cases in which the death penalty has not been imposed.

We have carefully reviewed the record, and in our opinion the evidence warrants the verdict of the jury and the sentence imposed.

Appellant was approximately 34 years of age at the time of the homicide on Monday, November 5, 1984. The decedent, Linda Jones Cooper, was 31 years of age. They had been married since October 24, 1981.

Appellant had been unemployed since the early part of 1984, while his wife was regularly employed. He testified to tension and strain in the home, because of his inability to obtain work. The parties separated in late July or early August 1984, and Mrs. Cooper filed a petition for divorce on August 29, 1984. The ground alleged in the petition was that of "irreconcilable differences" as authorized in T.C.A. § 36–4–101(11). The complaint was filed according to the procedure prescribed in T.C.A. 36–4–103 and was accompanied by a property settlement agreement executed by both spouses. The waiting period prescribed in T.C.A. § 36–4–103(c) had expired shortly before the homicide, but the case had not yet been docketed for final hearing and disposition.

During the separation of appellant and his wife, he frequently telephoned her both at her place of employment and at home. He testified that he knew that she had been dating another individual. On October 20, 1984, a little more than two weeks prior to the homicide, he caused a disturbance at her mother's home and became involved in a fight with the man whom she was dating. At trial appellant avowed his deep love for his wife, although he said that he had no objection to her dating another individual. He professed that the divorce was his idea, in the hope that the parties might remain close friends during their separation and that ultimately they might be remarried. Another interpretation which might reasonably be drawn from the evidence is that appellant was very jealous of his wife and that he harassed, threatened and intimidated her to the point of distraction for several weeks prior to the homicide.

Mrs. Cooper worked at a self-service Exxon gasoline station. The facilities were equipped with several drive-in gasoline pumps and a small kiosk in which the cashier received payments from customers. Entry to this small brick-and-glass booth was through a single door at the end opposite the cashier's station. The lower portion of the door was metal and the upper portion, comprising somewhat more than half of the surface, consisted of a large glass plate inserted into a metal frame.

Mrs. Cooper did not work on Sunday, November 4, but appellant attempted to call her at her home on several occasions. She spoke with him once briefly but when he called again she refused to speak to him. The mother of Mrs. Cooper told appellant that his wife did not wish to speak to him. She testified:

> "And he said 'Well,' said 'I'm gonna kill her.' He said, 'I've got a check of my mother's and I'm gonna sign her name, and I'm gonna buy a gun and I'm gonna kill her and myself, too, cause I know if I don't I'll spend the rest of my life in jail.'"

Mrs. Jones, the victim's mother, testified that she told appellant that he was causing great concern to his own mother and that he was going to cause trouble. She told him that some innocent person might be injured but appellant "said they wouldn't be anybody around when he did it."

According to Mrs. Jones this call was received on the morning of Sunday, November 4. Appellant admitted making this call and numerous other calls to the home of Mrs. Jones, his wife's mother. He admitted making the threat to which she testified.

The record is clear that appellant carried out that threat. Early on the next morning he did in fact cash a check belonging to his mother and purchased a 20–gauge Winchester pump shotgun.

Prior to doing so he had driven to the service station where his wife worked, early in the morning, at about 6:45 a.m. At that time he purchased and paid for a small amount of gasoline but said nothing to his wife, who received the payment. An area manager for the employer was present at that time, and she testified that Mrs. Cooper was very upset and concerned because of the appearance of her husband.

After purchasing the shotgun, appellant returned to the service station and bought more gasoline. The manager, who was still present, testified that when he came to the window to pay for the gasoline, appellant angrily told his wife several times that he was going to kill her. She repeatedly replied that she did not want to talk with him. The manager called the police as appellant continued to harass his wife. When the manager hung up the telephone, appellant told her to begin looking for someone else to work after that week, because he was going to kill his wife. He then got into his automobile and the manager saw him raise "a black cylinder object" in the back seat towards the window. She testified that he appeared angry, but he drove away before a police officer answered her call. When the officer arrived he advised Mrs. Cooper, who was extremely upset, to obtain a warrant for the arrest of her husband.

Thereafter appellant went to his home and test-fired the shotgun to be sure it was working. He then inserted five shells into it and drove back toward the station. He stopped and drank coffee, then drove to the station and parked next to the cashier's booth. The manager had left by that time, but a trainee cashier, Deborah Monroe, was in the booth with Mrs. Cooper. Mrs. Cooper again telephoned the police while appellant, seated in his car, patted the barrel of the shotgun and told his wife "You're dead." He then left the car and immediately shot through a side window of the booth. Mrs. Cooper and Mrs. Monroe, neither of whom was hit, threw themselves to the floor. Appellant then walked around to the back door of the booth and pointed the gun at the door. At this point his terrified wife cried that she was willing to speak to him, but appellant, who testified that by then it was too late, deliberately fired four shots through the glass door killing his wife.

His own testimony, which corroborated all of the details of his previous activities on November 4 and November 5, described the shooting. After stating that the first shot, fired through the side window, missed the victim he testified:

"Q. Then what did you do?

A. I walked to the back of the kiosk. She stood up and she said, 'I'll talk, I'll talk.' And when she said that, that made me really mad.

Q. Then what did you do?

A. I took aim and shot her.

Q. How many times did you shoot her?

A. Four times.

Q. Why did you shoot her more than once?

A. Because of the glass partition I figured it might do something, I wasn't sure. I'm not too good at guns; I didn't know that much about 'em.

Q. During the time that you were shooting what were you thinking? What were you feeling?

A. I was saying to myself, 'God, forgive me.' I couldn't believe what I was doing. It seemed like a long time ever time I shot her. It just ... it was ... quite a few seconds would go by ever time I'd take a shot."

Eyewitnesses testified that appellant first fired into the building, calmly walked to his automobile, turned around and walked back and shot twice more. He had, of course, to pump the shotgun between each of the shots.

On cross-examination appellant testified that he had been angry because his wife would not talk with him. The testimony is as follows:

"Q. What did she do to make you so mad or so angry that you walked around, when she was in this kiosk and she couldn't get out, and you fired four rounds of No. 2 buckshot into her?

A. (No response).

Q. What did she do, Mr. Cooper?

A. I just wanted to talk and she wouldn't talk to me.

Q. Even before you shot, Mr. Cooper, even before you shot, she looked up and said, 'Vernon, I'll talk to you. All right, I'll talk to you.' Do you remember that?

A. Yes, sir.

Q. She would talk to you at that time and that's all you wanted, wasn't it? Isn't that what you told us? That's all you ever wanted is for her to talk to you, isn't it?

A. After the first shot I figured it was too late.

Q. She did that before you ever shot her, didn't she, Mr. Cooper?

A. Yes, sir.

Q. When you shot through the side and she realized death was coming, and you walked around to the back, and she looked up and said, 'I'll talk to you; all right, I'll talk to you,' you had not shot a shot at her at that time, had you?

A. (No response).

Q. Had you?

A. No, sir.

Q. And after she said that in a desperate cry to talk to you, that's when you unloaded on her, wasn't it?

A. (No response).

Q. Wasn't it?

A. Yes, sir.

Q. And then you left. Calmly walked back to your car, calmly got in your car, and you left.

A. Yes, sir.

Q. And the police chased you at speeds of up to eighty-five miles an hour. You were weaving in an out of traffic. You were driving over across the median. Why didn't you stop at that point? Why didn't you just stop? Why didn't you turn yourself in and say, 'I've done something terrible?'

A. I was scared at that time."

The testimony concerning the deliberate execution of his wife by appellant was corroborated by a number of eyewitnesses who saw or heard all or part of the shots being fired. His demeanor was described as being calm although apparently angry, and insofar as the record reveals he was in full possession of his faculties. He has been twice evaluated for mental illness and found competent. It is obvious from the testimony that his victim was greatly frightened. She or her manager had twice called the police to try to prevent this senseless and entirely unprovoked homicide, and there can be no question from an examination of the record that the victim was terrified by the conduct and the threats of the appellant.

The medical examiner could not determine which of the four shots killed Mrs. Cooper. The entire left upper portion of her body was literally filled with shotgun pellets which had penetrated both lungs, her heart, and her brain. She was certainly conscious and in terror from the time the first shot was fired into the side window, when no one was hit, at least until the next shot was fired through the plate glass door. Whether she was killed instantly or whether she survived through the next three shots, all of which were fired with deliberate aim and from a different point through the door, cannot medically be determined.

It would be difficult to describe a more deliberate, brutal and horrifying infliction of death upon an innocent, unarmed person. In our opinion the circumstances of this homicide were heinous, atrocious and cruel. The deliberate taunting and threatening of a victim for hours before shooting at her once, causing her and her fellow employee to dive to the floor for safety, and then deliberately pumping the contents of four shotgun shells into her while she was helplessly trapped inside a small building could, in our opinion, convince a reasonable jury that the victim was subjected to

torture and that the perpetrator of such conduct evinced depravity of mind.

Counsel for appellant relies heavily upon the decision of this Court in *State v. Pritchett,* 621 S.W.2d 127 (Tenn.1981) in which the victim was shot twice at point-blank range with a shotgun in the back of his head. The victim, however, was not aware of this impending fate, and death was obviously instantaneous. Although the Court held in that case that the evidence was not sufficient to sustain the aggravating circumstance involved here, the facts of that case do not approach those presented in this record. It was the opinion of this Court that the evidence in *Pritchett, supra,* was insufficient to sustain the aggravating circumstance in light of the holding of the United States Supreme Court in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).[2]

We are of the opinion that the evidence in the present case does warrant the finding by a jury that the aggravating circumstance was proved beyond a reasonable doubt and not outweighed by any mitigating factor. In *State v. Williams,* 690 S.W.2d 517, 529 (Tenn.1985) the Court discussed this aggravating circumstance and the dictionary definitions of the words used in the statute. The Court said:

"Our statute provides that it is *the murder* which must be *especially* heinous, atrocious or cruel. The second clause of this statutory provision, *viz.* ' . . . in that it involved torture or depravity of mind,' qualifies, limits and restricts the preceding words 'especially heinous, atrocious or cruel.' This second clause means that to show that the murder was especially heinous, atrocious or cruel the State must prove that it involved torture of the victim or depravity of mind of the killer.

" 'Torture' means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. In proving that such torture

occurred, the State, necessarily, also proves that the murder involved depravity of mind of the murderer, because the state of mind of one who willfully inflicts such physical or mental pain on the victim is depraved."

The Court held that there could be depravity of mind without torture, but in the present case we are of the opinion that both were clearly proved and that a trier of fact could find the presence of both beyond a reasonable doubt upon the evidence adduced.

In the case of *Harvard v. State,* 414 So.2d 1032, 1036 (Fla.1982), *cert. denied,* 459 U.S. 1128, 103 S.Ct. 764, 74 L.Ed.2d 979 (1983), *reh'g denied,* 460 U.S. 1017, 103 S.Ct. 1264, 75 L.Ed.2d 489 (1983), the defendant had previously harassed his wife and then stalked and lay in wait for her. A finding that the murder was heinous, atrocious or cruel was sustained. In that case death was shown to have been almost instantaneous. In the present case that is problematical. The examining physician testified that the victim could have lived for some minutes after first being shot.

We have carefully examined the entire record. We find nothing disproportionate or arbitrary about the action of the jury in concluding that the death penalty was warranted under the circumstances presented here.

The judgment of the trial court is affirmed at the cost of appellant. Sentence will be carried out as prescribed by law on January 16, 1987, unless otherwise ordered by this Court or other proper authority.

FONES, COOPER and DROWOTA, JJ., concur.

BROCK, C.J., concurs in the foregoing opinion except for the imposition of the death penalty. He continues to adhere to the views expressed in his dissenting opin-

---

**2.** After the opinion cited was rendered, Godfrey was again sentenced to death for the murder of his mother-in-law. The penalty was upheld on the basis of a different aggravating factor from that discussed by the Supreme Court in the opinion cited. *See Godfrey v. Georgia,* 248 Ga. 616, 284 S.E.2d 422 (1981), *cert. denied,* 456 U.S. 919, 102 S.Ct. 1778, 72 L.Ed.2d 180 (1982), *reh'g denied,* 456 U.S. 1001, 102 S.Ct. 2286, 73 L.Ed.2d 1296 (1982).

ion in the case of *State v. Dicks*, 615 S.W.2d 126, 132 (Tenn.1981) that the death penalty is unconstitutional.