IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 29, 2025 Session

**STATE OF TENNESSEE v. JOHN BASSETT**

**Appeal from the Criminal Court for Knox County
No. 119852    G. Scott Green, Judge**

_____

**No. E2024-01681-CCA-R3-CD**

_____

The Defendant, John Bassett, appeals from his conviction for first degree premeditated murder, for which he received a life sentence without the possibility of parole. On appeal, the Defendant contends that (1) the evidence was insufficient to support his conviction because the State failed to prove beyond a reasonable doubt that he was responsible for the victim's death and that he acted with premeditation and (2) the evidence was insufficient to support an enhanced sentence based upon the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. After review, we affirm the judgment of the trial court with respect to the Defendant's conviction. However, we reverse the judgment of the trial court with respect to the Defendant's sentence and remand the case for the entry of an amended judgment sentencing the Defendant to imprisonment for life.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court
Affirmed in Part & Reversed in Part; Case Remanded**

KYLE A. HIXSON, J., delivered the opinion of the court, in which JILL BARTEE AYERS and TOM GREENHOLTZ, JJ., joined.

Joshua D. Hedrick, Knoxville, Tennessee, for the appellant, John Bassett.

Jonathan Skrmetti, Attorney General and Reporter; John H. Bledsoe, Deputy Attorney General; Johnny Cerisano, Assistant Attorney General; Charme P. Allen, District Attorney General; and Rachel S. Hill and Joanie Stallard Stewart, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I.     FACTUAL AND PROCEDURAL HISTORY

This case arises from the June 19, 2021 shooting death of DeSheena Kyle, the victim, in her apartment in Knoxville. Following this incident, a Knox County grand jury charged the Defendant via presentment with first degree premeditated murder, tampering with evidence, and abuse of a corpse. *See* Tenn. Code Ann. §§ 39-13-202, -16-503, -17-312. The State filed a written notice that it intended to seek a sentence of life imprisonment without the possibility of parole as to the first degree murder charge. The Defendant pled guilty to the tampering with evidence charge, and the case proceeded to a jury trial on the two remaining charges. The bifurcated trial lasted seven days, beginning on May 9, 2023.

### A.     The Guilt Phase

Rita Turner, the victim's aunt, testified that the victim and the Defendant had been romantically involved on and off for several years. Ms. Turner stated that she went to the victim's apartment on June 25, 2021, the victim's birthday, to check on the victim after not having heard from her. Once there, she called law enforcement to perform a welfare check. In addition, Ms. Turner confirmed that she did not know the victim to be suicidal and was unaware of any attempts that the victim may have made on her own life. Ms. Turner further testified that she knew the victim to keep a neat and clean house.

Sergeant Michael Cooper of the Knoxville Police Department ("KPD") responded to the call. He testified that he was let into the victim's apartment by the property manager. Once inside the apartment, he observed that the window on the back side of the apartment was broken, there was blood smeared on the floor of the closet, and the victim was not present. Upon this discovery, KPD Officer Adam Winstead went to the Defendant's house to inquire about the victim's whereabouts. The Defendant did not appear to be present at the house, but Officer Winstead was able to speak with him over the phone, at which point the Defendant advised that he had not seen or talked to the victim recently.

Rachel Warren, a KPD crime scene technician, testified that she visited the victim's apartment and observed a wall sconce on the ground and a shoe print on the television, which was cracked and unplugged. Rollin McGowan, a KPD special crimes investigator, described the condition of the television in the victim's apartment: "It looked like somebody had knocked it over and set it back up, plugged it back in the TV, but forgot to

- 2 -

plug it into the wall." Ms. Warren recalled that there was some kind of liquid running down the back of the couch and that "something had been running down the wall" behind the victim's bed. Ms. Warren also discovered blood stains on the television, front door frame, bathtub, closet floor, and on a receipt on the victim's bedside table. Later Tennessee Bureau of Investigation testing confirmed that the blood from the television and front door frame matched the Defendant and that the blood found on the bathtub, closet floor, and the receipt matched the victim.

Investigator McGowan also shared a phone call with the Defendant a few days after the Defendant's phone call with Officer Winstead, and the Defendant again advised that he had not seen the victim and did not know where she was. Investigator McGowan interviewed the Defendant in person on June 29, 2021, during which the Defendant stated that he had not seen the victim since June 14 and that the two were no longer in a relationship.

Ms. Warren stated that she returned to the victim's apartment two weeks after the initial search and documented more items around the apartment. Ms. Warren recalled that there were reddish-brown stains seen on a mattress—one large and one small. She also documented more reddish-brown stains on the walls of the apartment.

The Defendant was next interviewed on July 7, 2021. He again stated that he had not seen or talked to the victim since June 14, 2021. During this interview, he also advised the investigators of some potential suspects he believed could be involved with the victim's disappearance, including a man that he alleged had been seen waiting outside of the victim's place of work, as well as two of her male neighbors.

KPD obtained search warrants to access data from the Ford F-150 rental truck that the Defendant had been driving in June 2021 and the Defendant's cell phones. Shannon Morris, a KPD digital forensics specialist, testified that the location data from the Defendant's phone and truck records showed that the Defendant was at the victim's apartment on June 17, 2021. Per the location data obtained from the Defendant's devices and photographs found in the Defendant's Snapchat memories, he and the victim went to dinner together that evening before going back to her apartment, where he spent the night. The Defendant left the victim's apartment for part of the day on June 18, but he returned to the apartment for about an hour during the afternoon and ultimately spent the night again. The Defendant proceeded to make various internet searches from 4:01 p.m. on June 18 to 9:36 a.m. on June 19 pertaining to implantation bleeding and determining when a woman is pregnant.

Later in the evening on June 19, the Defendant again conducted several internet searches. At 11:48 p.m., the Defendant searched, "How to keep person from biting tongue." Starting at 11:50 p.m., the Defendant made several searches looking for the definition of "biting [one's] tongue." Then, the Defendant searched, "Biting my tongue meaning shot in the head" at 11:53 p.m. and "How to stop biting the tongue" at 11:56 p.m. He also searched, "How long u have to life [sic] after being shot in the head" at 11:58 p.m. and again at 12:02 a.m. The Defendant also viewed two online articles titled, "Only 5% survive gunshot wounds to head" and "Can People Survive Gunshot Wounds to the Head?" at 11:58 p.m. and 11:59 p.m., respectively.

The location data from the Defendant's phone and truck records showed that the Defendant left the victim's apartment without his truck the night of June 19. The truck remained at the victim's apartment until 3:52 a.m. on June 21, 2021. The records reflected that, after the Defendant left the victim's apartment in his truck on June 21, he proceeded to make several stops, some of which included multiple visits to a property on McDonald Road. He first visited the McDonald Road property around 5:00 p.m. that day and left for about an hour before returning and staying at the property for approximately three and a half hours. Ms. Morris testified to the Defendant's various movements in the days that followed, including when the Defendant returned to the victim's apartment on June 25 around 5:00 a.m., where he stayed for about forty-five minutes before going to a property on Sam Tillery Road that used to belong to his great-grandmother. The Defendant's phone records showed that later that night he searched, "when police get a call from loved ones worried about them and they come to your house what usually happens next." He continued to make similar searches into the early hours of June 26.

Based on this location data, over the next few months, law enforcement proceeded to search "a significant amount" of different locations that the Defendant had visited and the Defendant's residence. Nicole Sauls, a KPD crime scene technician, assisted with a search of the Defendant's apartment. She collected several pairs of Nike shoes belonging to the Defendant; the soles of which, in her opinion, appeared to have the same pattern as the shoeprint on the television in the victim's apartment. She also took a box for a Smith & Wesson .357 revolver from the Defendant's residence.

Eventually, officers searched the McDonald Road and Sam Tillery Road properties. At the McDonald Road property, they found chairs from the victim's apartment, one of which had blood stains later confirmed to match the victim. At the Sam Tillery Road property, they found the victim's body.

- 4 -

KPD Lieutenant Michael Lance Earlywine testified that, while searching the Sam Tillery Road property on September 28, 2021, he went into the crawlspace of the abandoned house on the property. Once inside, he saw a truck bed toolbox with "a blanket or something hanging out of the side of it." Upon opening the box, he observed what appeared to be bone, a lot of flies, and a bad odor. After another officer confirmed that it appeared there was bone coming out of the toolbox, the toolbox was transported to the medical examiner's office.

The Knox County medical examiner, Dr. Darinka Mileusnic-Polchan, testified that when she received the toolbox, there was a comforter stuffed at one end, and although wrapped in various materials, some of the human bone was visible. Upon further inspection, Dr. Mileusnic-Polchan discovered that the toolbox contained a human body wrapped in layers of grocery store bags, trash bags, plastic wrap, and duct tape. Mark Crumpton, a forensic odontologist, confirmed that these remains matched the victim's dental records.

Dr. Mileusnic-Polchan determined that the cause of death was a gunshot wound that entered from the top left and exited at the back right area of the victim's head. Due to the presence of soot and gunpowder residue, it was consistent with a contact wound. She could not rule out a .357 caliber pistol as the weapon used. She testified that the wound would not have been immediately fatal but was "eventually" fatal from the combination of blood loss and brain swelling. She was unable to estimate a time frame for how long it would have taken the victim to die from the gunshot wound because the amount of time it takes for the brain to swell varies among individuals. Dr. Mileusnic-Polchan also stated that loss of bodily control, including urinating, defecating, and seizing, which could cause biting of the tongue, could all be expected from a gunshot wound to the head. There was no evidence that the victim was pregnant, nor were there any prescription medications in the victim's body at the time of her death. Based on the body's state of decomposition, including the deterioration of soft tissue, Dr. Mileusnic-Polchan was unable to determine whether the victim suffered any additional injuries.

Dr. Murray Marks, a forensic anthropologist, also examined the victim's remains. He observed a gunshot wound to the left side of the skull. According to Dr. Marks, the bullet entered just above and behind the victim's left ear at an angle and traveled downward and backward through her skull exiting the right side. He observed fragmenting to the victim's skull due to trauma from the gunshot wound. He explained, "[M]ost of that fracture would be synonymous with a high-degree of force that was imparted on that

neurocranium. But there could be other things that might have taken place." There were no observable fractures from the neck down, and while there could have been superficial damage to the victim's soft tissue, he could not say due to the body's level of decomposition.

The State also presented evidence of an altercation between the victim and the Defendant that occurred on the afternoon of June 18, 2021, before the victim's death the following evening. Robert Davis, a mechanic who was repairing a car at the Knob Hill apartment complex on June 18, testified that he saw the Defendant "grab [the victim] by the throat and throw her against the wall and say, 'I'll kill you, b----,'" before getting into a late-model, four-door Ford F-150 and driving away. Tatyana Jones, the Knob Hill resident who was getting her car repaired, testified that she was waiting underneath a nearby tree when she heard yelling and breaking glass before seeing a man come out from behind the apartment building. According to Ms. Jones, the man tried to get into an apartment in the victim's building before getting into his truck. Ms. Jones stated that she was unable to identify the man, but she described him as a Black male, a description which includes the Defendant. She also said that the man was wearing a white shirt and had "wild" hair. Additionally, Joy Jenkins, the property manager, testified that the victim called her on June 18 to report that the window at the back of her apartment was broken. Ms. Jenkins noted that, when she went to see the window, she observed that the victim appeared "scared" and "very nervous." She offered to let the victim stay in her office, but the victim did not accept her offer.

The Defendant elected to testify in his own defense and corroborated much of the State's evidence. He stated that everything he had previously told law enforcement was a lie. He confirmed that he spent time with the victim and slept at her apartment between June 17 and 19, 2021. He also confirmed that he and the victim had gotten into an argument at her apartment on June 18, during which the victim scratched his Ford F-150 rental truck with a curtain rod and he broke the window behind her apartment. The Defendant testified that the victim had told him she was pregnant with another man's child.

Regarding the victim's death, the Defendant testified that the victim woke him up on June 19 with his phone in her hand, upset that he was talking to another woman. He alleged that she threatened to kill herself and put a .357 caliber handgun, that he had previously given her, to her head. The Defendant was unable to explain when the victim grabbed the gun, suggesting that it just "appear[ed] by her head." He also claimed that it was in her left hand, despite the victim's being right-handed. He stated that he tried to approach the victim to calm her down, at which point she backed away from him and into

- 6 -

a chair that was in her closet. When she turned around to see what she bumped into, the Defendant claimed that he lunged for the gun, and it went off, resulting in the victim's gunshot wound to the head and her collapse into the chair. He did not know if the victim was still alive. He then proceeded to make the various internet searches to which Ms. Morris had previously testified. The Defendant confirmed that he did not attempt to apply pressure to the victim's wound, call 911, or search "how to help someone shot in the head." In his own words, he just "wanted to make sure she was going to die."

After the shooting, the Defendant fled the victim's apartment on foot. He took the firearm and the shell casing with him, eventually disposing of the firearm but taking the shell casing to his house. Law enforcement recovered this shell casing in a search of the Defendant's bedroom, and on cross-examination, the Defendant identified it as the one he took from the scene.

Additionally, the Defendant testified that he returned to the victim's apartment on June 21 and June 25, 2021, to clean the scene, using bleach and rags that he found in the apartment. On the first visit, he took the chair the victim fell into when she died and its matching counterparts to the McDonald Road property. On the second visit, he wrapped up the victim's body with grocery bags, trash bags, plastic wrap, and duct tape, all of which he found in the apartment, before pushing it through the broken back window of the apartment and putting it into the backseat of his truck. The Defendant then took the victim's body to the Sam Tillery Road property, where he put the body into the truck bed toolbox and placed the toolbox into the crawlspace of the house.

According to the Defendant, the victim's gunshot wound was self-inflicted. Suggesting a history of mental health issues, the Defendant claimed that there were times when the victim refused to get out of bed and would cover her apartment windows with bedding. During one incident on November 26, 2020, the victim came over to his house around 4:00 a.m. and punched his window when he would not answer her. When he brought her into his bedroom to try to tend to her hand because it was bleeding, she grabbed a gun from off his bed and put it to her head, yelling that she did not want to "be here" anymore. After calming her down, the Defendant called one of her aunts and informed her of the situation, and the victim's aunt called 911. The 911 call was played for the jury. During the call, the victim's aunt, based upon information provided to her by the Defendant, can be heard informing the 911 operator that the victim was bleeding, suicidal, and unmedicated, despite her being bipolar and schizophrenic. The body camera footage from the officers who responded to the scene was played for the jury. The victim appeared relatively calm and denied being suicidal or having any mental health issues. The

Defendant did not mention anything to law enforcement about the victim's alleged attempt to kill herself.

The Defendant also presented evidence of prior altercations with the victim, the most recent of which he alleged was partially responsible for the disarray of the victim's apartment. During this incident in May 2021, the Defendant and the victim got into an argument at her apartment, during which she pushed him into a mirror in her living room, which cut his arms and caused him to bleed. Frustrated over the argument and his injuries, he kicked the television. He also testified to a previous incident in which he and the victim were arguing about a woman who had called him and the victim stabbed him in the calf. The Defendant's great-uncle, Jeff Webster, also testified to an incident that occurred several months before the victim's death, where the victim threw a rock at the Defendant's car while the couple was arguing.

After deliberation, the jury found the Defendant guilty of first degree premediated murder and abuse of a corpse. A sentencing hearing ensued.

B.      The Sentencing Phase

The State sought a sentence of life imprisonment without the possibility of parole for the Defendant's murder conviction. In support of this enhanced sentence, the State alleged two aggravating circumstances: that the murder was especially heinous, atrocious, or cruel and that the Defendant knowingly mutilated the body of the victim. *See* Tenn. Code Ann. § 39-13-204(i)(5), (13).

Relying on the evidence introduced during the guilt phase of the trial, the State did not present any additional evidence regarding the especially heinous, atrocious, or cruel aggravator. Regarding the knowing mutilation of the body aggravator, the victim's grandmother, Betty Deas, testified about the family's burial traditions and stated that the victim's body was not found in a state that would allow the family to follow these traditions. Ms. Deas also testified that, while the victim was missing, she discussed with the Defendant her concerns about possible decomposition of the victim's body.

At the conclusion of the proof, the jury declined to find that the Defendant knowingly mutilated the victim's body but found that the especially heinous, atrocious, or cruel aggravator applied. Based upon the presence of this aggravating circumstance, a sentence of life imprisonment without the possibility of parole was imposed.

The Defendant filed a timely motion for new trial, challenging both issues he raises on appeal. The trial court, following a hearing, denied the motion, finding that the evidence was sufficient to support the Defendant's murder conviction and to support the jury's finding of the especially heinous, atrocious, or cruel aggravating circumstance. This timely appeal followed.

## II. ANALYSIS

The Defendant raises two issues on appeal. First, he asserts that the evidence was insufficient to support his conviction for first degree premeditated murder because the State failed to prove beyond a reasonable doubt that he was responsible for the gunshot which killed the victim and that he acted with premeditation. Second, he asserts that the evidence was insufficient to support the jury's finding of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. The State responds that the evidence was sufficient to sustain both the jury's finding of guilt as to first degree premeditated murder and its application of the especially heinous, atrocious, or cruel aggravator. We address each issue in turn below.

### A. Sufficiency of the Convicting Evidence

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id.* (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.

1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

First degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § -11-106(a)(21).

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § -13-202(d).[1] "Premeditation may be inferred from the manner and circumstances of the killing." *Finch v. State*, 226 S.W.3d 307, 318 (Tenn. 2007) (citing *Bland*, 958 S.W.2d at 660). Several circumstances may bear on the existence of premeditation, including but not limited to:

(1) The use of a deadly weapon on an unarmed victim;

(2) The particular cruelty of the killing;

(3) Threats or declarations of intent to kill;

(4) The procurement of a weapon;

(5) Any preparations to conceal the crime undertaken before the crime was committed;

(6) The destruction or secretion of evidence of the killing;

---

[1] This subsection was redesignated in 2021 and is now located at Tennessee Code Annotated section 39-13-202(e). 2021 Tenn. Pub. Acts, ch. 394, § 1.

(7) Calmness after the killing;

(8) Evidence of motive;

(9) The use of multiple weapons in succession;

(10) The infliction of multiple wounds or repeated blows;

(11) Evidence that the victim was retreating or attempting to escape when killed;

(12) The lack of provocation on the part of the victim; and

(13) The failure to render aid to the victim.

*State v. Reynolds*, 635 S.W.3d 893, 916-17 (Tenn. 2021). The list of specific circumstances developed through case decisions is not exhaustive, however, and the trier of fact "is not limited to any specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgment." *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (citation modified).

Here, the Defendant argues that no reasonable juror could have found beyond a reasonable doubt that he shot the victim in the head and that he did so with premeditation. First, he contends that the "law requires a connection between an act or omission by [the Defendant] and the gunshot" and that "no proof of such a connection" existed in this case. Rather, he argues that the State's evidence merely established that the victim died from a gunshot wound to the head, which is consistent with his testimony that the victim's wound was self-inflicted. Contrary to the Defendant's argument, the State presented evidence that the victim was shot on the left side of her head at close range, despite being right-handed. Additionally, the jury heard the Defendant's theory that the victim's wound was self-inflicted via suicide or accidental discharge and rejected it. It is the province of the jury to accept or reject the evidence presented at trial, and this court will not reweigh the evidence on appeal. *See Bland*, 958 S.W.2d at 659.

Second, the Defendant contends that "there is no proof of premeditation." We cannot agree. Evidence showed that the Defendant thought the victim was pregnant with another man's child and that the day prior to the victim's being shot, an altercation occurred

between the two, during which the Defendant threatened to kill the victim. *See State v. Trusty*, 326 S.W.3d 582, 595-96 (Tenn. Crim. App. 2010) (holding that there was sufficient evidence of premeditation where, among other things, the defendant declared his intent to kill the victim if she ever left him). After the victim was shot, the Defendant failed to render aid or call 911. *See State v. Banks*, 271 S.W.3d 90, 139 (Tenn. 2008) (concluding that there was sufficient evidence of premeditation based in part on the defendant's failure to provide aid or assistance to his victim after he shot him). Instead, for over twelve minutes, the Defendant conducted multiple internet searches about biting one's tongue after being shot in the head, how long before someone dies after being shot in the head, and what an individual's survival rate is after being shot in the head. In the Defendant's own words, he just "wanted to make sure she was going to die." He then concealed evidence of the crime by hiding the victim's body, disposing of the gun, relocating the shell casing from the victim's apartment, cleaning the victim's apartment, and removing blood-stained furniture from the victim's apartment. *See Reynolds*, 635 S.W.3d at 917; *State v. Adams*, 405 S.W.3d 641, 649, 663 (Tenn. 2013) (holding that the defendant's disposal of the victim's body in a park in addition to other factors supported the element of premeditation); *Bland*, 958 S.W.2d at 660 (considering the defendant's disposal of the murder weapon in its conclusion that the there was sufficient evidence to establish premeditation). From this evidence, a reasonable juror could infer that the Defendant acted with premeditation. The jury's verdict in this case accredited the testimony and evidence presented by the State, as was its prerogative. *See Grace*, 493 S.W.2d at 476. The Defendant is not entitled to relief.

### B. Sufficiency of the Aggravating Circumstance

Once a defendant has been found guilty of first degree premeditated murder, a sentence of imprisonment for life without the possibility of parole may be imposed upon a unanimous finding by the jury that the State has proven beyond a reasonable doubt the existence of one or more of the statutory aggravating circumstances. *See* Tenn. Code Ann. § 39-13-204(i). The standard for reviewing the sufficiency of the evidence of an aggravator is the same as for reviewing the sufficiency of the evidence of an offense of conviction. *See State v. Smith*, 893 S.W.2d 908, 912-13 (Tenn. 1994) (applying the same sufficiency of the evidence standard when evaluating the jury's finding of guilt and its finding of the heinous, atrocious, or cruel aggravator). As such, "the proper inquiry for [this court] is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt." *State v. Suttles*, 30 S.W.3d 252, 262 (Tenn. 2000).

- 12 -

By statute, there are nineteen different aggravating circumstances, including, as relevant here, that "[t]he offense was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death[.]" Tenn. Code Ann. § 39-13-204(i)(5). The court has specified that, when evaluating this aggravating circumstance, "it is the *murder* which must be *especially* heinous, atrocious, or cruel." *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985). In determining the meaning of the words in the statute, the Tennessee Supreme Court has relied on their ordinary dictionary definitions:

> Heinous—"Grossly wicked or reprehensible; abominable; odious; vile."
>
> Atrocious—"Extremely evil or cruel; monstrous; exceptionally bad; abominable."
>
> Cruel—"Disposed to inflict pain or suffering; causing suffering; painful."

*Id.* (citing AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE). As the focus is on the circumstances of the murder, there is no required *mens rea*. *State v. Carter*, 988 S.W.2d 145, 150 (Tenn. 1999). "Whether the defendant intended the victim's suffering is irrelevant." *Id.*

The second clause of this statutory provision "qualifies, limits and restricts the preceding words 'especially heinous, atrocious or cruel," meaning to show that the murder was especially heinous, atrocious, or cruel, the State must prove that such treatment involved either torture of the victim or severe physical abuse beyond that necessary to produce death. *See Williams*, 690 S.W.2d at 529 (analyzing a prior statutory version); *see also State v. Keen*, 31 S.W.3d 196, 206 (Tenn. 2000). Our supreme court has observed that "torture" and "serious physical abuse" are separate and distinct theories. *See State v. Odom*, 928 S.W.2d 18, 26 (Tenn. 1996). Additionally, "[t]he law does not require that jurors agree as to which theory supports their view that the murder is 'especially heinous, atrocious, or cruel.'" *State v. Jones*, 568 S.W.3d 101, 139 (Tenn. 2019) (citing *Keen*, 31 S.W.3d at 209).

Torture is defined as "[t]he infliction of severe physical pain as a means of punishment or coercion; the experience of this; mental anguish; any method or thing that causes such pain or anguish; to inflict with great physical or mental pain." *Williams*, 690 S.W.2d at 529 (citing AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE). Our supreme court further expounded on the definition of "torture" to include "the

infliction of severe physical or mental pain upon the victim while he or she *remains alive and conscious*." *Id.* (emphasis added). As such, "[t]he torture prong of (i)(5) only requires a jury finding that the victim remained conscious and sustained severe physical or mental pain and suffering between the infliction of the wounds and the time of death." *Carter*, 988 S.W.2d at 150.

As for the theory of serious physical abuse, our supreme court has stated that the terms within the phrase "'serious physical abuse beyond that necessary to produce death' are self-explanatory[.]" *State v. Hall*, 8 S.W.3d 593, 601 (Tenn. 1999). Specifically,

> The word "serious" alludes to a matter of degree. The abuse must be physical, as opposed to mental, and it must be "beyond that" or more than what is "necessary to produce death." "Abuse" is defined as an act that is "excessive" or which makes "improper use of a thing," or which uses a thing "in a manner contrary to the natural or legal rules for its use."

*Odom*, 928 S.W.2d at 26 (quoting BLACK'S LAW DICTIONARY (6th ed. 1990)).

On appeal, the State argues that sufficient evidence supports the jury's finding that the victim was tortured or sustained serious physical abuse beyond that necessary to produce her death. First, the State submits the altercation on June 18, 2021, in which the Defendant broke the victim's apartment window, grabbed her by the throat, threw her against a wall, and threatened to kill her, brought about mental distress for the victim until her death the following day. The State then avers that "the incident on June 18, 2021, does not stand alone in establishing that the murder was especially cruel." The State maintains that the physical struggle between the Defendant and the victim on the evening of June 19 increased the victim's physical and mental anguish immediately prior to the Defendant's taking the victim to her closet and shooting her in the head at close range. Finally, the State contends that the Defendant's failure to render aid after the victim was shot—a shot that was not immediately fatal—while she was convulsing and biting her tongue until her eventual death further contributed to her mental anguish. The State notes that the jury could have found the aggravator based on its acceptance of any combination of these theories, and it encourages this court to consider the culmination of each of these circumstances to evaluate the sufficiency of the evidence.

The Defendant argues that his case is not as severe as those where the especially heinous, atrocious, or cruel aggravating circumstance has been upheld on appeal. First and foremost, the Defendant notes there was no evidence of any injury or trauma to the victim

- 14 -

other than the single gunshot wound to the head and that the gunshot wound "caused at least near-instant death." Further, the Defendant argues that the June 18 assault is too temporally distant from the murder itself to satisfy the aggravating factor.

At trial, the proof regarding the victim's manner of death showed that she died from a single gunshot wound to the head and that she was shot inside a closet in her residence. Dr. Mileusnic-Polchan testified that the victim's death was not immediate, and the Defendant's search history certainly suggested that the victim may have lived for some time and experienced seizures following the close-range gunshot wound. But, there was no evidence offered to support any reasonable inference that the victim remained conscious after she was shot. And, to find that the Defendant tortured the victim based upon his actions subsequent to the shooting, the jury would need to find that the victim remained conscious while she sustained severe mental pain and suffering prior to her death. *See Carter*, 988 S.W.2d at 150.

We also recognize that our supreme court has denoted the anticipation of physical harm to oneself, under certain circumstances, as being torturous. *See id.* However, in this case, we have little evidence of what occurred in the victim's apartment prior to the shooting. It was also unclear how the victim came to be shot in the closet or for how long the gun might have been held to her head. At trial, there was evidence presented of a tumultuous on-again-off-again relationship between the Defendant and the victim throughout their time together, and which suggested that there may have been times when the victim played an active role in their altercations. Although the victim's aunt testified that the victim usually kept a neat and clean house, there was no evidence that the victim's apartment, immediately prior to any struggle with the Defendant on June 19, was in a neat and orderly condition. And, while there were traces of the Defendant's and the victim's blood in different areas around the apartment, the record failed to establish when or under what circumstances this evidence was left behind. Nor did the record demonstrate when or how the television was damaged—other than the Defendant's testimony that it occurred the month prior—or when or how the sconce was knocked off of the wall.

To conclude that the victim experienced torture beyond that necessary to produce her death, the jury would have had to speculate as to whether there was a struggle between the Defendant and the victim that evening and whether the Defendant was the primary perpetrator during this struggle, and which culminated in his forcing the victim into her closet and holding her there at gunpoint for some length of time before shooting her in the head. Matters of pure speculation cannot support any reasonable inference on the part of the jurors that any of this caused the victim to experience mental distress or anguish prior

- 15 -

to her death. *See State v. Pack*, 421 S.W.3d 629, 643 (Tenn. Crim. App. 2013) ("Although the State is entitled to all reasonable inferences from the proof, the jury may not speculate an accused into the penitentiary."); *see also State v. Beckham*, No. 02C01-9406-CR-00107, 1995 WL 568471, at *17 (Tenn. Crim. App. Sept. 27, 1995) (concluding that there was insufficient evidence to establish mental torture for the purposes of the heinous, atrocious, or cruel aggravator where, despite the victim's being handcuffed and driven around by the defendant in a truck for two hours, the victim was shot once in the head, killing him, and what happened during the truck ride would be "pure speculation").

The State emphasizes the altercation between the victim and the Defendant that occurred on June 18, the day prior to the victim's death, in the parking lot of the apartment complex and maintains that this prior altercation plays a role in establishing the victim's mental anguish prior to the shooting. However, this previous incident occurred over twenty-four hours before the victim's murder. Additionally, based upon location data, the Defendant spent the night at the victim's apartment on the evening of June 18 following the earlier altercation that day. Assuming that the Defendant and the victim had reconciled, any mental anguish on the part of the victim based upon this June 18 event had seemingly dissipated.

And, the instances in which our supreme court has determined that such circumstances in domestic violence cases have sufficiently established the aggravator involved greater temporal proximity between the continued threat of harm and the murder than have been shown in the present case. *See State v. Cooper*, 718 S.W.2d 256, 257-60 (Tenn. 1986) (affirming, as sufficient, evidence that the homicide was especially heinous, atrocious, or cruel where the defendant deliberately harassed and threatened the victim, his estranged wife, "to the point of distraction for several weeks prior to the homicide" and, on the day of the murder, called the victim's house numerous times, told her mother that he intended to kill the victim, and went to the victim's place of work multiple times where he repeatedly told her that he was going to kill her before returning to her workplace and ultimately shooting her four times with a shotgun); *Hall*, 8 S.W.3d at 600-01 (concluding that sufficient proof of the (i)(5) aggravator was presented where the defendant used child support as a ruse to meet with his estranged wife to attempt reconciliation, intended to make her "feel the helplessness" that he felt if she would not reconcile, disconnected the telephone lines to the house before the meeting, threatened to kill her if her children went for help, severely beat her and inflicted at least eighty-three separate wounds, and caused her death through combination of strangulation and drowning"); *State v. Jordan*, 325 S.W.3d 1, 67-69 (Tenn. 2010) (observing, in upholding the imposition of the especially, heinous, atrocious, or cruel aggravator, that the defendant instilled a significant fear of

death in his estranged wife by repeatedly leaving her threatening messages the night before he entered her place of work yelling her name and first shooting her in the leg). Accordingly, the effect of this prior altercation on the victim's mental state at the time of the murder, *i.e.*, that she was still suffering under the mental pain or anguish caused by those prior actions at the time of her death, is merely speculative given the nature of the couple's relationship and the intervening circumstances between this prior June 18 incident and the murder. *See Williams*, 690 S.W.2d at 529-30 (holding that, if acts occurring after the death of the victim are relied upon to show the defendant's depravity of mind, then such acts must be shown to have occurred close to the time of the death to provide a rational basis for the trier of fact to infer that the defendant's state of mind at the time of the killing was depraved); *Terry v. State*, 46 S.W.3d 147, 160-61 (Tenn. 2001) (noting, under a prior version of the statute, that "the time factor merely assists in directly relating the post-mortem mutilation to the commission of the murder, thereby establishing the defendant's depravity of mind at the time of the murder"). Moreover, viewing all of this evidence cumulatively does not remedy its speculative nature. *See Pack*, 421 S.W.3d at 643; *Smith*, 893 S.W.2d at 912-13.

Finally, there was no evidence presented to the jury of additional injuries that the Defendant inflicted upon the victim incident to the murder. *See Terry*, 46 S.W.3d at 161 (stating that "any dismemberment of a corpse can establish depravity of mind if the acts can be considered incident to the murder and not separate, distinct or independent from it" (citation modified)). The victim's body remained in her apartment for several days before the Defendant removed it to another location. Again, based upon the evidence presented, anything that occurred to the remains of the victim during this time would be matters of pure speculation. Both Dr. Mileusnic-Polchan and Dr. Marks were unable to observe any additional injuries besides the gunshot wound to the head upon their respective examinations of the victim's remains. The state of decomposition, including the absence of much of the victim's soft tissue, prevented discovery or corroboration of any further circumstances leading to her death. Accordingly, because no additional injuries beyond the gunshot wound could be detected, and because there was insufficient evidence establishing the circumstances of any physical struggle between the Defendant and the victim leading to the shooting, there was no reasonable inference supported by the evidence that the victim suffered any serious physical abuse beyond that necessary to produce her death. *See Odom*, 928 S.W.2d at 26 (noting that Tennessee Code Annotated section 39-13-204(i)(5) narrows the construction of "serious physical abuse" to abuse "beyond that necessary to produce death"); *e.g.*, *Brown v. State*, 644 So.2d 52, 53-54 (Fla. 1994) (holding that insufficient evidence was presented to support the especially heinous, atrocious, or cruel aggravator when the medical examiner testified that the victim's body

was badly decomposed and all that could be determined was that the victim had been stabbed three times and none of the wounds would have been immediately fatal).

The especially heinous, atrocious, or cruel aggravator is to be "reserved for application only to those cases which, by comparison or contrast, can be articulately determined to be the very 'worst of the worse.'" *Odom*, 928 S.W.2d at 26-27. As our supreme court has stated, "We well understand that almost all murders are 'heinous, atrocious, and cruel' to some degree, and we have no purpose to demean or minimize the ordeal this murder victim experienced." *Id.* at 26. However, we are constrained to conclude that the evidence in the record does not support the jury's finding that the murder was especially heinous, atrocious, or cruel. Similar to *Odom*, to affirm the finding of this aggravator under these circumstances would require its application almost every time a violent domestic relationship is involved. *See id.* (finding that the circumstances of the victim's rape did not constitute torture and that to apply the heinous, atrocious, or cruel aggravator would effectively permit every murder in the perpetration of a rape to be automatically classified as a death eligible offense for purposes of the (i)(5) aggravator).

The serious physical abuse or the torture inflicted must meet the test of heinous, atrocious, or cruel. *See State v. Pritchett*, 621 S.W.2d 127, 139 (Tenn. 1981) (noting, under a prior version of the statute, that "this aggravating circumstance requires evidence that the defendant inflicted torture on the victim before death or that defendant committed acts evincing a depraved state of mind; that the depraved state of mind or the torture inflicted must meet the test of heinous, atrocious, or cruel"). Here, based upon the evidence presented, it does not satisfy this strenuous test. *See, e.g.*, *id.* (holding that the killing, in which the defendant confronted the victim and then fired two rounds from a twelve gauge shotgun into the back of the victim's neck, did not support this aggravating factor because "the evidence [was] inescapable that [the victim's] death was instantaneous from the first gunshot shell that was fired"); *Williams*, 690 S.W.2d at 529-30; *Odom*, 928 S.W.2d at 26-27; *Beckham*, 1995 WL 568471, at *17; *cf., e.g.*, *Jordan*, 325 S.W.3d at 67-69; *Hall*, 8 S.W.3d at 600-01; *Cooper*, 718 S.W.2d at 259-60. Because the evidence was insufficient to support the application of the sole aggravator found by the jury in this case, the Defendant's sentence of life imprisonment without the possibility of parole is vacated, and the Defendant shall receive a sentence of imprisonment for life. *See* Tenn. Code Ann. § 39-13-204.

### III.    CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court with regard to the Defendant's conviction but reverse the judgment of the trial court with regard to the Defendant's enhanced sentence.  We remand the case to the trial court for the entry of an amended judgment sentencing the Defendant to imprisonment for life.


 s/Kyle A. Hixson
KYLE A. HIXSON, JUDGE